70247. ROBERTS v. GRIGSBY et al.
(339 SE2d 633)

BANKE, Chief Judge.

On December 12, 1979, Otis Reed, Jr., was charged with 2 counts of aggravated assault after he stabbed another individual several times and then attempted to kill a police officer called to the scene of the stabbing. He was adjudicated not guilty by reason of insanity at the time of the assaults and was involuntarily committed at Central State Hospital in Milledgeville, Georgia, from January 17, 1980, until September 12, 1980, when he was transferred to West Georgia Regional Hospital in Columbus, Georgia.

On December 17, 1980, Donald P. Grigsby, Ph.D., Chief of the Psychological Section and the Forensic Services at West Georgia Regional Hospital, recommended that Reed be discharged, stating that he found Reed to be free of mental disorder, posing no danger to himself or others, and able to care for himself. Although initially opposed to the release of Reed, the district attorney eventually acquiesced in the discharge. On March 11, 1981, the superior court accepted Grigsby's recommendation and ordered Reed's release.

Following his release, Reed attended one session at a mental health outpatient clinic, at which time he indicated that he felt no need for medication or other services. On February 24, 1982, more than 11 months after his release, Reed's sister and mother contacted Carl Dunlap, a social worker with the adult mental health clinic operated by the Columbus-Muscogee County Health Department, and requested treatment for Reed, reporting that his behavior once again had become aberrant. Reed's sister and mother further reported that

Reed had purchased a handgun from a pawn shop and that the pawnbroker had returned the money seeking "to get back the gun." Dunlap, by deposition, recalled (1) explaining what the procedures for involuntary commitment were and that treatment generally could not be forced upon Reed unless he presented an imminent danger to himself or others and (2) offering to arrange an appointment. (Reed's mother denied that Dunlap so advised her.) The following day, Reed's mother and father asked Reverend Barto Roberts to accompany them to Reed's apartment to help persuade Reed to seek treatment. During that visit, Reed became agitated and shot and killed the Reverend Mr. Roberts.

The appellant, Roberts' widow, subsequently commenced this action against Dr. Grigsby, Dr. Sadi Oguz (a staff psychiatrist at West Georgia Regional Hospital), Dunlap, Paul Crofford (a mental retardation service coordinator with the adult mental health clinic at the Columbus-Muscogee County Health Department), and several other employees of West Georgia Regional Hospital, alleging that they had been negligent in treating Reed, in recommending his release from involuntary commitment, and in failing to monitor him on a regular basis following his release. This appeal is from the trial court's grant of summary judgment to all the defendants. *Held*:

1. Each of the defendants must be considered immune from liability pursuant to the Supreme Court's decision in *Hennessy v. Webb*, 245 Ga. 329 (264 SE2d 878) (1980), wherein it was held that, in the absence of a lawful waiver of such immunity or a showing of wilful, wanton, or malicious misconduct, governmental officers or agents are exempt from liability for actions undertaken in their official capacity and within the scope of their official duties. This court's recent decision in *Jackson v. Miller*, 176 Ga. App. 220 (335 SE2d 438) (1985) (cert. den.), is neither in conflict with *Hennessy* nor authority for a contrary ruling in the present case. There, we held that the *Hennessy* doctrine does not insulate physicians employed by public clinics from liability to their patients for professional malpractice. The defendants in the present case are not sought to be held liable for the death or injury of a patient resulting from the provision of negligent medical care. Rather, they are charged with the breach of an alleged duty owed to the public in general, arising from the performance of official governmental functions respecting the confinement of individuals who present a substantial risk of imminent harm to themselves or others. See generally OCGA §§ 17-7-131 (a); 37-3-1 (12); *Moses v. State*, 167 Ga. App. 556 (307 SE2d 35) (1983). Like prison officials or probation officers, they clearly enjoy a qualified immunity from such liability under *Hennessy*.

2. With respect to the West Georgia Regional defendants, at least, the statutory immunity provided by former Code Ann. § 88-

502.23 (currently OCGA § 37-3-4) is also applicable. That code section, as it existed during the period of time relevant to this case, provided as follows: "Any physician, peace officer, attorney, health official, or hospital official, agent, or employee, whether employed by a private hospital or at facilities operated by the state, a political subdivision of the state, or by a hospital authority created pursuant to the Hospital Authorities Law of Georgia, Chapter 88-18 of the Georgia Code, who acts in good faith in compliance with the admission and discharge provisions of this chapter, shall be immune from civil or criminal liability for his actions in connection with the admission of a patient to a facility or the discharge of a patient from a facility." Ga. L. 1978, pp. 1789, 1806.

3. In ruling that the defendants are protected from liability by the doctrine of governmental immunity, we express no opinion as to whether a fact issue would otherwise exist with respect to the merits of the appellant's claim.

*Judgment affirmed. McMurray, P. J., Sognier, Pope and Benham, JJ., concur. Pope, J., also concurs specially. Deen, P. J., Birdsong, P. J., and Beasley, J., concur specially. Carley, J., concurs in Divisions 1 and 3 and in the judgment.*

DEEN, Presiding Judge, concurring specially.

1. While agreeing with the majority opinion's conclusion that all the defendants in this case are shielded from liability by the general doctrine of governmental immunity under *Hennessy v. Webb*, 245 Ga. 329 (264 SE2d 878) (1980), I believe that this court's recent decision in *Jackson v. Miller*, 176 Ga. App. 220 (335 SE2d 438) (1985), represents an obstacle that must first be hurdled or eliminated. In *Jackson v. Miller*, this court held that the defense of governmental immunity is not available to a state-employed physician who has been sued individually in a wrongful death action over the alleged negligent treatment of the plaintiff's child at the state facility. In so holding, this court emphasized (1) that the defendant doctor had not acted in an administrative matter; (2) that the doctor's alleged negligent treatment of the child could not "reasonably be considered that of an agent of the government acting in his official capacity"; and (3) that the doctor's primary duty was a private one to his patient rather than a public one to the state. Id. at 220-221. That analysis results in an impermissible limitation of the Supreme Court's rule delineated in *Hennessy v. Webb*, supra, and I believe that *Jackson v. Miller* must be overruled.

*Hennessy v. Webb* makes available the defense of governmental immunity to a public employee, even though he is sued individually, for discretionary acts within his official capacity, unless the public employee acted wilfully, wantonly, or beyond the scope of his author-

ity. Although the defendant in that case held an administrative position as principal of a school, nothing in the decision limits application of that proposition to administrative officers. Where the government assumes the function of providing medical services to the public, the personnel employed by the state to fulfil that function act as agents of the state. That protective agency relationship evaporates only when the employee's official capacity does not involve acts of discretion or when the employee acts wilfully, wantonly, or beyond the scope of his authority, and it does not matter what position is held by the public employee. Specifically, where diagnosis and planning treatment, essentially discretionary acts, are precisely the duties assigned to a state physician, mere negligence in the performance of that duty does not remove the act from the realm of his official capacity.

The primary duty of a state-employed physician is always public, because the physician acts for the state, and this court cannot ignore that legal relationship in characterizing the physician's duty. Under *Hennessy v. Webb*, a state physician's personal liability for discretionary acts may result from a breach of that public duty, i.e., an act that is wilful, wanton, or beyond the scope of his authority; it is not because the physician's primary duty is owed to whichever patient he may treat, as held in *Jackson v. Miller*, supra. It follows that, contrary to the holding in *Jackson v. Miller*, the defense of governmental immunity is available to state physicians even in malpractice actions, absent a breach of that public duty. Since *Jackson v. Miller* ignores the proper analysis for determining the availability of this defense, it should be overruled.

In the instant case, all four defendants clearly were protected by governmental immunity. The decisions involved with the plan of treatment for and the release of Reed certainly were acts of discretion, within the scope of the defendants' official capacities and authority, and were obviously not wilful or wanton. The trial court correctly granted summary judgment for the defendants.

2. In any event, the uncontradicted evidence demanded a finding that none of the defendants had been negligent. OCGA § 17-7-131 (a) in effect at the time pertinent to this case provided that in all criminal trials where an accused is adjudicated not guilty by reason of insanity at the time of the commission of the crime, the trial court was to commit the accused to a state mental hospital for a period of not less than 30 days in order to inquire into the sanity of the accused at the time of the acquittal. That section further provided that "[a] person committed to the Department of Human Resources pursuant to this Code section shall not be released from confinement unless and until, after notice and hearing, the court which committed him finds and determines that the person does not meet the criteria for civil commitment under Chapter 3 or 4 of Title 37." Under Chapter 3 of

Title 37, a person meets the criteria for civil commitment if he is mentally ill and "presents a substantial risk of imminent harm to himself or others, as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to himself or to other persons, or . . . is so unable to care for his own physical health and safety as to create an imminently life-endangering crisis." OCGA § 37-3-1 (12). (Chapter 4 of Title 37 concerns mental retardation and is inapplicable here.) *Moses v. State*, 167 Ga. App. 556 (307 SE2d 35) (1983).

An application for release of the committed person may be filed by either the person himself or the superintendent of the institution in which the person is confined. OCGA § 17-7-131 (b) (now OCGA § 17-7-131 (f)). This statutory treatment of a person involuntarily committed because of an adjudication of not guilty by reason of insanity allowed for only two possibilities upon such an application for release, i.e., release of the person upon a finding that he no longer met the criteria for civil commitment, or continued involuntary commitment upon the opposite finding. See "Commitment & Release of Persons Found Not Guilty by Reason of Insanity: A Georgia Perspective," 15 Ga. L. Rev. 1065 (1981).

The validity of the appellant's asserted cause of action strictly depended upon Reed's having been released at a time when he still met the criteria for civil commitment. The evidence of record in this case strongly demonstrated that Reed in fact no longer presented a substantial risk of imminent harm to himself or others at the time of his recommended release from West Georgia Regional Hospital. In the course of his 6-month commitment at the hospital, during which he was observed on a daily basis, Reed had not manifested any acts or threats of violence. For the last 4 months of his confinement, medications were unnecessary to stabilize any psychosis. A thorough regimen of tests consistently produced negative results for active mental illness. Reed's mother acknowledged that at the time of Reed's release, his behavior was good and remained so for the next 5 or 6 months. That Reed presented no risk of imminent harm at the time of his release was further demonstrated by the fact that for almost 11 months, he lived a quiet and peaceful life.

The appellant's expert witness attempted to rebut the defendant's evidence by contending that Reed's present dangerousness was shown by his psychiatric history and criminal record of "decomposition from accepted behavior following prior releases from psychiatric hospitals." However, that indefinite possibility of a recurrence of psychosis at some unknown point in the future did not refute the uncontroverted evidence that Reed no longer met the civil commitment criteria requiring a substantial risk of imminent harm; that information alone provided an insufficient basis for reasonably anticipating immi-

nent harm.

The appellant also contends that the defendants associated with West Georgia Regional Hospital were negligent in not recommending that Reed's release be conditioned upon his seeking continued treatment on an out-patient basis at the adult mental health clinic, and that Paul Crofford with the mental health clinic was negligent in not coordinating out-patient treatment for Reed following the latter's release. There was no legal authority, however, by which such a conditional release could be ordered. The current OCGA § 17-7-131 (h) does provide for probation conditioned upon out-patient psychiatric treatment for a defendant who is found guilty but mentally ill at the time of the felony. OCGA § 37-3-81 (c), concerning regular involuntary civil commitment for psychiatric evaluation, also authorizes a court to order placement on an out-patient treatment program, rather than hospitalization, if such an arrangement controls the danger presented by that person. However, as discussed above, the statute in effect at the time of Reed's release authorized but two alternatives for this situation: continued hospitalization or release.

In any event, it was undisputed that the defendants at West Georgia Regional Hospital did recommend continued psychiatric treatment for Reed as an out-patient at the mental health clinic, and a referral and initial appointment for this service actually were made at the time of Reed's release. Reed refused that service after that one appointment, and the defendants were without authority following Reed's release to force such out-patient treatment upon him.

In summary, the evidence of record demanded the finding that Reed no longer met the criteria for civil commitment at the time of his release; *ipso facto*, the recommendation of the West Georgia Regional defendants that Reed be released (as well as the precedent treatment of Reed) could not be held negligent. Similarly, insofar as no legal authority existed for mandatory out-patient treatment as a condition of Reed's release, the failure to recommend or coordinate such could not constitute negligence. Accordingly, summary judgment for the West Georgia Regional defendants (and Crofford) was appropriate.

Additionally, it must be emphasized that the ultimate decision to release Reed was that of the superior court, and not that of the staff of West Georgia Regional Hospital. OCGA § 17-7-131; see *Clark v. State*, 245 Ga. 629 (266 SE2d 466) (1980); *Dubose v. State*, 148 Ga. App. 9 (251 SE2d 15) (1978). In deciding whether an involuntarily committed defendant should be released because he no longer meets the civil commitment criteria, the superior court is not bound to accept the recommendation of the treating psychiatrist(s) or psychologist(s). *Moses v. State*, supra; *Dubose v. State*, supra. In short, this writer is unpersuaded by the appellant's attempt to impose liability

upon the defendants in this case, where the decision to release Reed (notwithstanding its apparent acceptance of the recommendation to release) was an independent judicial determination by the committing court.

I am authorized to state that Presiding Judge Birdsong joins in this special concurrence.

POPE, Judge, concurring specially.

I concur in our decision here that summary judgment for the four defendants was appropriate under the doctrine of sovereign immunity. I offer the following remarks, however, in response to the special concurrences of my brethren.

1. The issue pretermitted by our decision in this case is whether state and county employees of mental health facilities have a legal duty to control the conduct of a former patient to prevent him from causing physical harm to others. Appellant alleges that defendants Grigsby and Oguz (hereinafter "hospital defendants") were negligent in their recommendation to release Reed from involuntary commitment. In addition, appellant alleges that defendants Dunlap and Crofford (hereinafter "clinic defendants") were negligent in failing to keep Reed on an outpatient basis. The Supreme Court addressed a similar issue in 1982 in *Bradley Center v. Wessner*, 250 Ga. 199 (296 SE2d 693) (1982), in which a cause of action was allowed against a private mental hospital and its staff for failure to warn the victim of one of its patients. In *Bradley Center*, the appellant mental health hospital was held civilly liable for the murder of appellees' mother by their father, a patient at appellant's facility. The hospital had given appellees' father an unrestricted weekend pass after he had indicated that if given the opportunity, he would hurt his wife. The Supreme Court invoked an exception to the general rule that there is no legal duty to control the conduct of third persons to prevent them from causing physical harm to others. According to the court, " 'where the course of treatment of a mental patient involves an exercise of "control" over him by a physician who knows or should know that the patient is likely to cause bodily harm to others, an independent duty arises from that relationship and falls upon the physician to exercise that control with such reasonable care as to prevent harm to others at the hands of the patient.' " 250 Ga. at 201, citing *Bradley Center v. Wessner*, 161 Ga. App. 576, 581 (287 SE2d 716) (1982). By holding the hospital liable, the Supreme Court stated it was not creating a new tort but rather applying "traditional tort principles of negligence." 250 Ga. at 202.

The holding in *Bradley Center* parallels cases in other jurisdictions that have imposed liability on psychotherapists for failing to use reasonable care to give threatened persons warnings sufficient to avert

foreseeable danger arising from his patient's condition. For example, in *Tarasoff v. Regents of Univ. of Cal.*, 529 P2d 553 (Cal. 1974), a psychotherapist was held to be subject to liability for the wrongful death of the victim of one of his patients. The California Supreme Court in *Tarasoff* found that a special relationship exists between the patient and his psychotherapist and is sufficient to impose an affirmative duty on the therapist to warn affected third persons of impending danger from the patient. A duty exists "[i]f in the exercise of reasonable care the therapist can warn the endangered party or those who can reasonably be expected to notify him. . . ." 529 P2d at 561. The rule in *Tarasoff* was followed in *McIntosh v. Milano*, 403 A2d 500 (N.J. Super. 1979). The New Jersey court imposed liability on a psychiatrist who failed to warn the victim of one of his patients of the danger imposed by that patient. According to the court, "a psychiatrist or therapist may have a duty to take whatever steps are reasonably necessary to protect an intended or potential victim of his patient when he determines, or should determine . . . that the patient is or may present a probability of danger to that person." 403 A2d at 511-12.

The decisions in *Bradley Center, Tarasoff* and *McIntosh* all base liability on the aspect of the foreseeability of the harm to third persons or the harm to the mental patient himself. The *Bradley Center* rule, however, goes one step further. The plaintiff must establish foreseeability of the harm *and* the defendant's ability to control the actions of the patient. Although the Supreme Court has thus recognized a cause of action against mental health facilities in circumstances similar to the facts at bar, I find that appellant has not established the foreseeability or control necessary to prevail in the case at bar under the *Bradley Center* rule.

Hospital defendants, Grigsby and Oguz, were governed by OCGA § 17-7-131 (a) in effect at the time pertinent to this case in their release recommendation. That section provides that a person adjudicated not guilty by reason of insanity and committed to a state mental hospital shall not be released unless a court finds that he does not meet criteria for civil commitment. According to OCGA § 37-3-1 (12) a person meets the criteria if he is mentally ill and presents a substantial risk of imminent harm to himself or others. As is pertinent here, the risk of harm is to be determined by recent overt acts or recent expressed threats of violence which present a probability of physical injury to himself or others. The record shows that during Reed's confinement at West Georgia Regional Hospital, Reed did not show any violent or threatening behavior. Tests designed to determine mental illness revealed that Reed's mental illness was in remission. Based on that information, there was no evidence that the hospital defendants knew or should have known that Reed presented a

substantial risk of imminent harm.

In addition, clinic defendants Crofford and Dunlap had no reason to know that Reed was likely to cause bodily harm. Crofford met with Reed during Reed's first visit at the clinic. Reed told Crofford that he was fine and did not need the clinic's services. Such a statement along with knowledge of the court's release of Reed from involuntary commitment, does not reveal that Crofford did know or should have known about Reed's substantial risk of harm to others. Dunlap had only one contact concerning Reed. Reed's sister and mother contacted Dunlap the day prior to the shooting. Reed's relatives informed Dunlap that Reed had not harmed or threatened anyone but had bought a gun which the pawnshop was taking back. Based on that information and no evidence to show that Dunlap should have been familiar with Reed's case, Dunlap had no reason to know, nor should he have known, that Reed was likely to cause bodily harm.

The second element of the *Bradley Center* rule — control — also cannot be found from the facts at bar. In *Bradley Center* the hospital was held to have control because it allowed the patient an unrestricted weekend pass during which time the murder was committed. In this case, however, the hospital and clinic defendants did not have the ability to control Reed at the time of the murder. Reed had not been a patient at either the hospital or the clinic for several months. Therefore, since (1) it was not foreseeable that Reed was likely to cause harm, and (2) defendants did not have the ability to control Reed, the rule in *Bradley Center* does not apply.

2. According to my brethren, OCGA § 17-7-131 (b) in effect at the time pertinent to this case allows only two possibilities upon an application for release: unconditional release or continued involuntary commitment. I respectfully disagree. OCGA § 17-7-131 (b) merely *allows* for release if the civil commitment criteria is not met and continued commitment if such criteria is present. The section, therefore, does not preclude a superior court from rendering any other decision it deems reasonably necessary. A superior court has general and broad powers in cases over which it has jurisdiction. See *Johnson v. State*, 177 Ga. 881 (1a) (171 SE 699) (1933). Subsections (4) and (8) of OCGA § 15-6-9 provide that superior courts have authority to "exercise all other powers necessarily appertaining to their jurisdiction" and to "grant all other writs . . . which may be necessary to the exercise of their jurisdiction and which are not expressly prohibited." As indicated above, OCGA § 17-7-131 (b) does not expressly prohibit other actions by the superior court. Therefore, the court in the case at bar could have conditioned the patient's release or given any other order to secure the safety of the patient and others. The very nature of mental illness demands that such procedures be implemented by the courts. A mentally ill person may not show signs of his illness

while institutionalized, yet, upon release or at some later time, symptoms of his illness may reoccur. Therefore, to help the patient with his mental illness as well as to protect the public from potential harm, a type of conditional release is an option for superior courts.

A form of conditional release, analogous to parole of convicted persons, is featured in nearly one-half of state criminal commitment statutes. See Note, "Commitment & Release of Persons Found Not Guilty By Reason of Insanity: A Georgia Perspective," 15 Ga. L. Rev. 1065, 1101 n. 221 (1981). Under a conditional release order, the superior court could release the patient on conditions the court deems necessary. If the conditions are not fulfilled, the court can order recommitment. Such conditions could include discharge of the patient to the custody of the family, outpatient care and periodic check-ups. See, e.g., Ill. Ann. Stat. Ch. 38 § 1005-2-4 (Smith-Hurd Supp. 1980).

A type of conditional release was proposed by the Mental Health Committee of the Georgia State Bar Association in 1980 in a draft of an amendment to then Code Ann. § 27-1503 (now OCGA § 17-7-131). The amendment would have given the court three alternatives in handling a person found not guilty by reason of insanity and meeting the civil commitment criteria. First, the court could order that the patient be hospitalized. Second, the patient could be ordered to comply with an outpatient plan for treatment. Finally, the patient could be hospitalized for a limited period followed by a court-ordered outpatient plan. The proposed amendment further provided that at anytime during a period of outpatient treatment, a patient could be hospitalized if his condition deteriorates or there is a probability of physical harm to himself or others. 15 Ga. L. Rev. at 1102 n. 227, supra.

I believe that a superior court has the power to order a conditional release even without a statutory amendment. Because the court possesses such power, there exists an issue for the jury as to whether the hospital defendants were negligent in not fully informing the court of Reed's condition. The record shows that the hospital defendants did find that Reed no longer met the civil commitment criteria. However, the record also reveals that Reed was referred to the Adult Mental Health Clinic for further therapy. According to defendant Oguz, patients are routinely referred to the health clinic if they need a "follow-up." In addition, defendant Oguz stated that had he known Reed would decline follow-up treatment, he might have changed his decision to release him. Had the hospital defendants informed the court that they believed Reed needed outpatient therapy, the court might have conditioned his release or not released him at all. Since the clinic defendants were not involved in recommending Reed's release, they had no duty to inform the court and therefore summary judgment in their favor should be affirmed.

BEASLEY, Judge, concurring specially.

I concur in the judgment but arrive by a different route.

I agree that the social workers and Dr. Oguz were immune from suit, but for the reasons explained below. As to Dr. Grigsby, the unquestionable application of another principle precludes liability, without a decision about sovereign or statutory immunity.

The crimes which led to institutional confinement in this case were committed on December 12, 1979. The trial at which Reed was found not guilty by reason of insanity at the time of the commission of the acts was on or about January 17, 1980. He was committed by virtue of being an insanity-acquitee rather than pursuant to the mental health code. The release from the institution occurred by order of the superior court filed March 11, 1981. The killing complained of in this civil suit occurred on February 25, 1982.

1. Dr. Grigsby cannot be held liable. He was a clinical psychologist and Chief of Forensic Services at West Central Georgia Regional Hospital when he wrote to the court on February 11, 1981. His letter was prompted by the federal court order in *Benham v. Edwards*, 501 FSupp. 1050 (N.D. Ga. 1980).[1] He simply stated the conclusion that "it is our professional opinion that [Reed] presently does not meet the criteria for civil commitment under Ga. Code Chapter 88-5." At the time, Code § 88-501 (v) defined "mentally ill person requiring involuntary treatment" as "a person who is mentally ill and (1) who presents a substantial risk of imminent harm to himself or others as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to himself or to other persons, or (2) who is so unable to care for his own physical health and safety as to create an imminently life-endangering crisis." All of the evidence shows that there were no *recent* overt acts or threats prior to Dr. Grigsby's letter. The evidence is undisputed that there were none in the entire time of Reed's confinement of over a year. Whether he presented a substantial risk of harm, much less "imminent" harm, was not the Georgia test. Dr. Grigsby requested a hearing on the question of Reed's continued commitment, "in order to comply with the mandate of the U. S. District Court," which required a hearing within 90 days of the federal order. He indicated to the court that Reed was indigent and requested an attorney. He also advised how hospital witnesses could be obtained. He submitted a form discharge order in case it was "the consensus of all concerned

---

[1] The later history of the class action suit leaves open to question whether Reed's release would have been mandated had the decision been able to await the final disposition of that case: modified, 678 F2d 511 (5th Cir. 1982); vacated and remanded sub nom. *Ledbetter v. Benham*, 463 U.S. 1222 (103 SC 3565, 77 LE2d 1406) (1983); remanded, 719 F2d 772 (5th Cir. 1983); judgment for defendant, 609 FSupp. 125 (N.D. Ga. 1985).

that the patient should be released without a hearing" and the court chose to follow that procedure, which Grigsby understood to be compatible with the federal court order because the State had "the burden of proving by clear and convincing evidence that the individual meets the criteria for involuntary hospitalization in Ga. Code Chapters 88-5 or 88-25." *Benham,* supra at 1076. No hearing was held. Nor did the court consult the superintendent or make further inquiry into the basis for Grigsby's conclusion. Instead, the court ordered that "Reed be released from confinement and commitment to West Central Georgia Regional Hospital." It was signed "approved" by the district attorney and an authorized representative of the Attorney General. Significantly, the court did not base its authority on the federal court order, which is not even mentioned, but rather on Georgia Code § 27-1503 (b).

The court did not follow the procedure required by that statute governing the release of persons confined as a result of judgments of not guilty by reason of insanity at the time of the offense. As it was then in effect, see Ga. Laws 1977, pp. 1293, 1295 § 2, it required a hearing.[2] Not only that, hearing and release were not authorized except upon application of the person committed or "the superintendent of the State hospital in which such person is confined." Brooks Cagle, and not Dr. Grigsby, was superintendent.

That aside, Grigsby only set in motion the consideration of whether Reed should be further confined, in obedience to a federal court order. As a matter of law, such action cannot constitute negligence, much less wilful, wanton misconduct or bad faith.

This pretermits the question whether Grigsby was immune from suit by way of the legislative grace provided in Ga. Code § 88-502.23. At the time he wrote to the court on February 11, 1981, and at the time the court acted on March 11, 1981, it exempted physicians, peace officers, attorneys, health officials, and hospital officials, agents, and employees. Effective July 1, 1981, "psychologists" were added. Ga. Laws 1981, pp. 996, 997, § 3. According to the state's brief, Grigsby was a clinical psychologist. Of course, it may be argued that he

---

[2] Under current law, a hearing is not necessary at the stage when the court is initially considering commitment, if after the 30-day evaluation following acquittal, DHR indicates that the defendant does not meet the involuntary civil commitment criteria. OCGA § 17-7-131 (e). But if the person is committed after that evaluation, the later application for release still requires a hearing, as it did under old § 27-1503. See OCGA § 17-7-131 (f). A hearing is not a vain thing, even if the hospital superintendent and the attorney general and the district attorney and the defendant all agree that the subject does not meet civil commitment criteria; they all have a vested interest in his discharge, and the court must make an independent judgment with the protection of society and potential victims in mind. See *Dubose v. State,* 148 Ga. App. 9 (251 SE2d 15) (1978); *Pitts v. State,* 151 Ga. App. 691, 695 (261 SE2d 435) (1979). "Protection to person (and property) is the paramount duty of government. . . ." Ga. Const. 1983, Art. I, Sec. I, Par. II.

was also a "health official, hospital official, agent or employee" and so was covered in that capacity as Chief of Forensic Services, even if the immunity for psychologists was not in effect when he acted. Oguz was a psychiatrist and thus a covered "physician" insofar as his involvement in discharge is concerned.

Also pretermitted is whether the psychologist immunity would attach because the suit was not brought until 1983 and the cause of action did not arise until the pastor's death in February 1982, after the July 1981 effective date of the amendment.

Finally, not reached is the question of whether the statutory immunity for persons involved in the admission and discharge of mentally ill persons to and from a mental health facility provided by Code § 88-502.23 supplants or supplements the general governmental immunity granted for discretionary acts of employees of the state and its political subdivisions. The statutory immunity covers more people, as it extends to attorneys and to private hospitals, than does governmental immunity. It provides immunity to one "who acts in good faith in compliance with the admission and discharge provisions of [Chapter 88-5]. . . ." Governmental immunity would extend to persons who have not acted with wilfulness, malice or corruption. *Hennessy v. Webb*, 245 Ga. 329 (264 SE2d 878) (1980); *Nelson v. Spalding County*, 249 Ga. 334 (1) (290 SE2d 915) (1982); *Truelove v. Wilson*, 159 Ga. App. 906, 907 (4) (285 SE2d 556) (1981). Whether these are the same I do not hazard a guess. Also, governmental immunity would cover a broader range of acts, such as medical diagnosis, care, and treatment, whereas the statutory immunity covers only "actions in connection with . . . admission . . . to a facility or . . . discharge . . . from a facility." Sovereign immunity would seem to prevent suit against all four appellees acting with discretion in their official capacities. *Dept. of Human Resources v. Briarcliff Haven*, 141 Ga. App. 448, 451 (233 SE2d 844) (1977).[3] Whether Dr. Grigsby was acting in a ministerial rather than discretionary manner when he simply complied with the federal court order need not be reached.

The release was not bottomed on anything that Oguz, or Crofford or Dunlap who only acted after the order, said or did, so there can be no liability of any of them based thereon.

2. The laws in effect at the times of concern here, i.e., when the crimes were committed, verdict returned, commitment ordered, and release subsequently ordered, were not the laws now extant. As to the verdict and procedures provided for, Ga. Laws 1977, pp. 1295-1302 applied. No change was made in that law, which added a new Code §

---

[3] Appellant disclaims any perceived attempt to sue the state anyway, conceding that sovereign immunity would bar it.

27-1503, until 1982. So the law as enacted in 1977 prevailed in 1979, 1980, and 1981. That law referred to the civil commitment law contained in Code Chapter 88-5 (and 88-25 regarding mentally retarded persons and thus of no consequence here). The Code Chapter referenced was as enacted by Ga. Laws 1978, p. 1789 et seq., and as amended by Ga. Laws 1979, p. 723 et seq. The latter became effective upon approval April 12, 1979, which was prior to Reed's commission of the acts which led to his hospitalization.

At all times relevant here, then, Code § 27-1503 provided that the person was to be "confined . . . in a State mental hospital." Further, "[a] person committed to the Department of Human Resources pursuant to this section shall not be released from confinement unless and until the court which committed him, after notice and hearing, shall find and determine that such person does not meet the criteria for civil commitment under Code Chapter 88-5. . . . Nothing in this section contained shall prevent the transfer of such person from one State hospital to any other State hospital by the Department of Human Resources or the transfer of such patient to a hospital in another state . . . (b) An application for the release of a person who has been committed to the Department of Human Resources under subsection (a), upon the ground he does not meet the civil commitment criteria under Code Chapter 88-5 or 88-25, as now or hereafter amended, may be made to the superior court . . . , either by such person or by the superintendent of the State hospital in which the said person is confined." The section goes on to provide that no hearing shall be had until the person is "confined" at least 30 days, and that if the finding of the court is adverse to "releasing" the person on the ground he meets the civil commitment criteria, it shall not hear another application for at least one year.

The statute speaks clearly and exclusively of confinement, in a hospital, and release therefrom. The civil commitment statute, which gives the criteria to be applied by the superior court in these criminal cases, does provide for treatment in "facilities" other than hospitals, and for individualized service plans which are developed for care and treatment in the "least restrictive environment." Thus, for the person involuntarily civilly committed, these "least restrictive alternatives" are available and may be considered by the civil commitment court. But facility is not the same thing as hospital. The Code defines "Facility" to mean "any State-owned or State-operated hospital or other facility utilized for the diagnosis, care, treatment, or hospitalization of persons who are mentally ill, any facility operated or utilized for such purpose by the United States Veterans Administration or other federal agency, and any other hospital or facility within the State of Georgia approved for such purpose by the department." Code § 88-501 (c). Hospital is therefore a specific kind of facility.

The criminal statute does not use the larger term "facility" but commands that a defendant acquitted not because he did not commit the act but because he was insane or incompetent at the time, be confined in a hospital. He can be released only if he does not meet the criteria for involuntary civil commitment, which are set out in Code § 88-501 (v). The court would have no authority to depart from the plain language of the statute by which the public policy was declared to be that a person acquitted in the manner of Reed was to be *confined* until he no longer was a mentally ill person requiring involuntary treatment. The treatment was prescribed by the criminal statute, not the civil commitment statute which provided a number of alternatives for persons civilly committed either voluntarily or involuntarily. Reed was simply in another category; he was not civilly committed but was instead committed because he was incompetent or insane at the time he committed a criminal act. I do not believe the general authority provided to superior courts in OCGA § 15-6-9 (4) or (8) enlarges this.

3. Finally, I would not extend *Bradley Center v. Wessner*, 250 Ga. 199 (296 SE2d 693) (1982), as the special concurrence urges, to give rise to a legal duty flowing from defendants to appellant's decedent here. The pastor, who voluntarily and at the request of his parishioners undertook to visit the mentally disturbed Reed some eleven months after his release from the mental hospital, was a remote person insofar as Reed was concerned. He was not a "readily identifiable" victim whom the defendants should have known might be harmed by Reed and so should have warned. If it is argued that they should have warned Reed's family, of their own and others' danger, the family already knew of it and in fact were even more familiar with Reed's propensities when free, and in fact complained about it after his release. Not only was there no readily identifiable victim, the evidence is undisputed that there were no "specific threats to specific victims." *Brady v. Hopper*, 570 FSupp. 1333, 1339 (N. Colo. 1983).

Appellant has not shown what legal duty of care was owed by the two social workers towards her husband or to the general public at large, arising out of their solitary encounters with Reed or with his mother and/or sister. Even if they were not immune from civil liability by way of Code § 88-502.23 because their actions were not "in connection with the admission of a patient to a facility or the discharge of a patient from a facility," they were immune pursuant to *Hennessy v. Webb*, 245 Ga. 329, supra; see also *Gray v. Linahan*, 157 Ga. App. 227 (276 SE2d 894) (1981). The only evidence which would remove the immunity is evidence of wilful, malicious, or corrupt acts; as to this there is nothing. Dr. Brown's affidavit is merely conclusory and states no facts which could form a basis for the jury to come to the same conclusion he did. It therefore does not constitute contrary

evidence. But even if the social workers were not immune, what was their duty to third persons such as the pastor who visited Reed eleven months after release? Crofford had no hint of present or future violence when Reed voluntarily visited him on March 23, 1981 soon after the court order releasing him. Dunlap had no knowledge of past behavior which the family did not have, as they were his sole source of that information. They gave no indication of recent overt acts or threats which would recommend a petition for involuntary civil commitment under Georgia law, a procedure the family knew about anyway even if Dunlap did not tell them about it. Dunlap, like Crofford, was only a social worker and was not qualified to predict dangerousness as a medical expert. Considering the circumstances, what did Dunlap fail to do with respect to any duty he owed to the pastor or to the general public of which the pastor was a member? Appellant is the one who fails, by not identifying the alleged duty or giving legal authority in answer to the question.

Appellant's real complaint is with the standards for commitment and release from confinement of persons found not guilty by reason of insanity, as those standards existed during the period in question. Despite any history of violent behavior prior to his hospitalization after the acquittal and its relationship to the predictability of future dangerousness, these are irrelevant because to continue commitment, *recent* overt acts or threats must have been manifested. None were.

Grigsby cannot be held liable because, even if not totally immune due to governmental immunity to begin with, or even if not immune because there are no facts upon which a jury could find wilful, malicious, or corrupt actions, he merely fulfilled a duty to report to the court the condition of Reed vis-a-vis his commitment status in accordance with the standard imposed by law in light of the federal court order. Grigsby's duty, if he had one, to the general public at large or to the pastor in particular was superseded by the superior court order; the release was not upon the independent judgment of Grigsby or the hospital authorities, but upon the judgment of the court.

If all of the acts alleged by plaintiff were admitted, there would still be no liability for release because none of them would have prevented Reed's right to release for being outside the definition of a commitable person, Code § 88-501 (12), in the context of the federal court order and the independent state court order. And conditional release was not an option for the court, under the law. Code § 27-1502 (b).

Even if the jury accepts as true everything that Dr. Brown testified to, there would be no liability. Dr. Brown's opinion is that what defendants did and failed to do constituted wilful and wanton disregard of the consequences, and that if they had acted within the standard of care required in the medical community generally (Dr. Brown

was an Alabama psychiatrist), they would not have recommended release because Reed "had the potential for violence. He was dangerous and it was foreseeable at the time of his discharge . . . that he represented a substantial danger of injury or death to persons coming in contact with him." That is not the question. Under the law then extant, Reed could not be kept confined unless there had been "recent overt acts or recent expressed threats of violence." There were none. Moreover, such concrete manifestations had to present a "substantial risk of imminent harm." The test for continuing commitment was not foreseeable future dangerousness.

4. It is unnecessary, then, to discuss the question of proximate cause, the third element of tort, since the record establishes that plaintiffs cannot reach this stage of the development of their complaint.

On a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided . . . must set forth *specific facts* showing that there is a genuine issue for trial." (Emphasis supplied.) OCGA § 9-11-56 (e). See *Jahncke Svc. v. Dept. of Transp.*, 172 Ga. App. 215 (2) (322 SE2d 505) (1984). As a matter of law, there are no material facts in dispute and summary judgment was mandated.

DECIDED DECEMBER 20, 1985 —

G. *Michael Agnew*, for appellant.

*Harry Dicus, John W. Denney, Michael J. Bowers*, Attorney General, *James P. Googe, Jr.*, Executive Assistant Attorney General, *H. Perry Michael*, First Assistant Attorney General, *Carol A. Cosgrove*, Senior Assistant Attorney General, for appellees.