74245. SWOFFORD et al. v. COOPER.
(360 SE2d 624)

McMURRAY, Presiding Judge.

Plaintiff Priscilla Swofford brought two medical malpractice actions against Dr. Annie B. Cooper, a practicing psychiatrist. A third medical malpractice action against Dr. Cooper was brought by Jerry Swofford, by Priscilla Swofford, his guardian (and mother). In each action, it was alleged that Oren Swofford, Priscilla Swofford's deceased husband, was stabbed to death by Jerry Swofford, the Swoffords' son and defendant's patient. In one case, Priscilla Swofford, individually and as executrix of the estate of Oren Swofford, sought damages for her husband's wrongful death and for the pain and suffering he endured before he died. In another case, Priscilla Swofford sought damages for the pain and suffering she herself incurred when she and her husband were attacked by their son. In the third case, Jerry Swofford by his guardian, Priscilla Swofford, sought the recovery of damages for the physical pain and emotional suffering which he incurred as a result of having killed his father. In that case, Jerry Swofford, by his guardian, also sought to recover the legal expenses which were incurred in a criminal matter stemming from the stabbing incident. Following discovery, the trial court granted summary judgment to defendant in each case and plaintiffs appeal. We reverse.

Jerry Swofford was given up for adoption by his natural mother shortly after he was born. During his early years, he lived in a number of foster homes. When he was five years old, he was placed with the Swoffords. Over the years, the Swoffords had cared for more than 100 foster children. They decided to adopt Jerry when he was eight years old.

Jerry's natural mother contracted rubella during her pregnancy. Consequently, Jerry has endured numerous mental and physical

problems. He is deaf, partially blind and mentally retarded. In addition, Jerry has heart problems, scoliosis and epilepsy.

When Jerry reached his teenage years he became combative and aggressive. He was placed in various schools and mental hospitals around the State. On December 10, 1982, Jerry was admitted to Parkway Regional Hospital. He remained there until January 12, 1983, when he was admitted to Georgia Regional Hospital at Atlanta. The physician's transfer certificate stated that Jerry had been homicidal and was threatening to kill his family.

Jerry was placed on the adolescent unit at Georgia Regional. Defendant was the staff psychiatrist of that unit. It was defendant's responsibility to supervise and direct Jerry's treatment. She was aware of Jerry's history of aggressive behavior and of the homicidal threats which he had made. Her treatment goals were to stabilize Jerry's behavior and to find appropriate placement for him.

Jerry remained at Georgia Regional for the next 11 months. During that time, Jerry was given a number of hourly, daily and weekend passes. The passes were given with defendant's approval. In the week before Christmas, defendant approved a two-week pass for Jerry.

The Swoffords took Jerry home on December 22, 1983. Four days later, as his parents slept, Jerry picked up a kitchen knife, entered their bedroom and fatally stabbed his father. Jerry's mother was awakened when her husband called out for help. Then Jerry attacked her. She was able to disarm Jerry without sustaining serious injury.

In an affidavit which she submitted in support of her motion for summary judgment, defendant averred that in treating Jerry she was at all times acting in her official capacity as a physician specialist on the staff at Georgia Regional Hospital at Atlanta; and that she acted in good faith in carrying out her duties. With regard to the issue of negligence, defendant opined that she exercised that degree of care and skill which, under similar conditions and like circumstances, is ordinarily employed by the medical profession.

In opposition to defendant's summary judgment motion, plaintiffs submitted the deposition testimony of Dr. Robert J. Alpern. It was Dr. Alpern's opinion that Jerry became more aggressive during his hospitalization at Georgia Regional; that, given the state of Jerry's aggressiveness, it was not prudent to issue a two-week pass to him; and that the issuance of such a pass to Jerry constituted medical negligence. In Dr. Alpern's words, the issuance of the pass was "below the acceptable level of care." Although Dr. Alpern stated that no one could have expected Jerry to fatally stab his father, he opined that "some sort of physical injury" was a foreseeable consequence of defendant's negligence. In this regard, Dr. Alpern commented that Jerry's aggressive behavior was apparent and that if that behavior was not contained when it occurred, assaultive behavior could have

been expected. *Held*:

1. In *Hennessy v. Webb*, 245 Ga. 329 (264 SE2d 878), the Supreme Court made it clear that the discretionary acts of public employees are protected by the doctrine of official immunity. Quoting from *Partain v. Maddox*, 131 Ga. App. 778 (206 SE2d 618), the court said: " 'It is a well-established principle that a public official who fails to perform purely ministerial duties required by law is subject to an action for damages by one who is injured by his omission. However, it is equally well established that "where an officer is invested with discretion and is empowered to exercise his judgment in matters brought before him, he is sometimes called a quasi-judicial officer, and when so acting he is usually given immunity from liability to persons who may be injured as a result of an erroneous decision; provided the acts complained of are done within the scope of the officer's authority and *without wilfulness, malice, or corruption.*" ' These discretionary acts '. . . lie midway between judicial and ministerial ones. The name of the public officer or officers is immaterial, and the question depends on the character of the act. If the act done for which recovery is sought is judicial or quasi-judicial in its nature, the officer acting is exempt from liability.' " *Hennessy v. Webb*, supra at 330, 331.

" '(I)n Georgia the distinction between a ministerial and a discretionary act, and therefore the scope of the immunity granted a public official in any given situation, turns upon the specific character of the complained-of act, not the more general nature of the job. *Partain v. Maddox*, (131 Ga. App. 778, 783 (206 SE2d 618) (1974)); *Price v. Owen*, [67 Ga. App. 58 (19 SE2d 529) (1942)]. Under this standard it makes no difference that the official is required to perform discretionary acts if the complained-of act is more properly characterized as ministerial. The grant of qualified immunity, then, is really more in the nature of a transitory privilege rooted in the fear that a contrary rule would inhibit the judgment upon which good government rests. The single overriding factor is whether the specific act from which liability allegedly arises is discretionary or ministerial.' *Miree v. United States*, 490 FSupp. 768, 773 (1980)." *Shuman v. Dyess*, 175 Ga. App. 213, 216 (333 SE2d 379). This determination is made on a case-by-case basis. Id. at 215.

In our opinion, the decision to permit a patient to leave a mental hospital for home visitation is undisputably a discretionary act. *Roberts v. Grigsby*, 177 Ga. App. 377 (339 SE2d 633). It "is precisely the type of governmental decision that discretionary immunity was designed to protect from tort litigation by after-the-fact review. . . ." *Cairl v. State*, 323 NW2d 20, 23 (Minn. 1982). In making such a decision, treating physicians must weigh the patient's physical and emotional needs, the suitability of the home milieu and the public safety. This decision should not be made with the threat of civil liability in

mind. A "plaintiff could undoubtedly find qualified psychiatrists who would testify that the treating physicians exercised negligent judgment, especially when they are fortified by hindsight. The effect would be fairly predictable. The treating physicians would indulge every presumption in favor of further restraint, out of fear of being sued. Such a climate is not in the public interest." *Sherrill v. Wilson*, 653 SW2d 661, 664 (Mo. banc 1983).

Defendant's approval of Jerry's two-week holiday pass was a discretionary act. It follows that defendant was cloaked with official immunity. *Hennessy v. Webb*, 245 Ga. 329, supra; *Roberts v. Grigsby*, 177 Ga. App. 377, supra.

2. Relying upon *Jackson v. Miller*, 176 Ga. App. 220 (335 SE2d 438), plaintiffs contend defendant is not immune from liability since the *Hennessy v. Webb*, 245 Ga. 329, supra, doctrine does not insulate public clinic physicians from liability to their patients for medical malpractice. We agree that defendant cannot invoke the doctrine of official immunity in the lawsuit brought by Jerry Swofford by his guardian, Priscilla Swofford. After all, Jerry was a patient of defendant. Thus, with respect to Jerry, defendant's "alleged negligence was simply that of a medical doctor in providing treatment to a patient." *Jackson v. Miller*, supra at 221. The *Hennessy v. Webb*, supra, doctrine does apply however, to the lawsuits brought by Priscilla Swofford.

Priscilla Swofford urges us to extend the *Jackson v. Miller*, supra, rationale to her own lawsuit and to the lawsuit which she brought individually and as executrix of her deceased husband's estate. In this regard, Priscilla Swofford argues that she and her husband were also "patients" of the defendant because they were counseled by defendant and her staff. We disagree. The record does not demonstrate that Priscilla Swofford and Oren Swofford necessarily or customarily participated in the consultation and treatment of Jerry. See generally *Sims v. State*, 251 Ga. 877, 881 (311 SE2d 161). At best, the record merely demonstrates that at times Priscilla Swofford and her husband were advised about the best way to handle Jerry in a given situation. It cannot be said that by receiving such advice, Mr. and Mrs. Swofford became defendant's "patients."

3. Defendant argues that Jerry Swofford cannot maintain the lawsuit brought by his guardian, Priscilla Swofford, for two reasons. First, she contends she is immune from civil liability under OCGA § 37-3-4. Second, she asserts the fatal stabbing of Oren Swofford by Jerry was unforeseeable. We disagree.

OCGA § 37-3-4 applies to "actions in connection with the admission of a patient to a facility or the discharge of a patient from a facility." It has no application to actions concerning the treatment of a patient. Consequently, it has no application to hourly, daily or holi-

day visitation passes dispensed by a physician in the treatment process.

With regard to foreseeability, we simply point out "that in order for a party to be held liable for negligence, it is not necessary that he should have been able to anticipate the particular consequences which ensued. It is sufficient if, in ordinary prudence, he might have foreseen that some injury would result from his act or omission, and that consequences of a generally injurious nature might result. *Wright v. Southern Ry. Co.*, 62 Ga. App. 316 (3) (7 SE2d 793)." *Emory Univ. v. Lee*, 97 Ga. App. 680, 691 (104 SE2d 234).

4. In its order granting summary judgment to defendant in all three lawsuits, the trial court ruled that Jerry Swofford could not maintain the lawsuit which his guardian, Priscilla Swofford, brought because Jerry himself was negligent. We disagree with this analysis. The record demonstrates that Jerry was psychotic when he stabbed his father. (Jerry was declared incompetent to stand trial and remains in a mental institution.) Thus, "he could not have been held to the exercise of any degree of diligence." *Emory Univ. v. Lee*, supra at 702.

5. Pointing out that defendant was insured by a policy of liability insurance which was purchased by the department employing defendant, plaintiffs contend that defendant's official immunity defense is waived to the extent of the insurance coverage. (The insurance policy provided for the payment of "all sums which the insured [defendant] shall become legally obligated to pay as damages, court costs and attorney fees, because of bodily injury, property damage or personal injury resulting from any job related occurrences caused by any insured.") In support of their contention, plaintiffs cite Art. I, Sec. II, Par. IX of the Constitution of the State of Georgia of 1983, which provides, in pertinent part: "[T]he defense of sovereign immunity is waived as to those actions for the recovery of damages for any claim against the state or any of its departments and agencies for which liability insurance protection for such claims has been provided. . . ." Defendant takes issue with plaintiffs' contention. She posits that the constitutional provision concerns the doctrine of sovereign immunity and applies only to the State, its departments and agencies. Thus, defendant takes the position that the official immunity doctrine is not affected by Art. I, Sec. II, Par. IX of the 1983 Constitution.

In *Martin v. Ga. Dept. of Public Safety*, 257 Ga. 300 (357 SE2d 569) (1987), our Supreme Court recently resolved this issue. In that case, employees of the Department of Public Safety argued that the purchase of liability insurance did not constitute a waiver of their official immunity. This argument was rejected, the Supreme Court holding: "Because negligence in performing official acts is covered by this insurance, these officers' official immunity is waived to the extent to which this coverage will pay for the claims asserted. *DeKalb*

*County School Dist. v. Bowden*, 177 Ga. App. 296, 300 (339 SE2d 356) (1985), cert. denied."

In the case sub judice, the acts of defendant were covered by a policy of liability insurance. It follows that defendant's official immunity is waived to the extent of that insurance. *Martin v. Ga. Dept. of Public Safety*, 257 Ga. 300, supra.

6. The trial court erred in granting defendant's motion for summary judgment in each of these medical malpractice actions. With regard to the lawsuit which Jerry Swofford, by his guardian (and mother), Priscilla Swofford, brought, the doctrine of official immunity is inapplicable. With regard to the lawsuit which Priscilla Swofford brought individually and as executrix of her husband's estate, and with regard to the lawsuit which she brought in her own right, seeking damages for the pain and suffering she herself incurred, defendant's official immunity was waived to the extent of defendant's insurance coverage.

*Judgment reversed. Birdsong, C. J., Banke, P. J., Carley, Sognier, and Benham, JJ., concur. Deen, P. J., concurs specially. Pope, J., concurs in judgment only. Beasley, J., concurs in part and dissents in part.*

Deen, Presiding Judge, concurring specially.

While personally agreeing with Judge Beasley's perspicacious analysis regarding the plan, purpose, and proper effect of purchasing insurance for state employees pursuant to OCGA § 45-9-1 et seq., the fact remains that the Supreme Court does not share that view. In *Martin v. Ga. Dept. of Public Safety*, 257 Ga. 300 (357 SE2d 569) (1987), the Supreme Court definitely held that purchase of such insurance (or establishment of a self-insurance fund) effects a waiver of both sovereign immunity and official immunity. In view of the holding in *Martin*, therefore, I agree with the majority opinion that the defendant was no longer shielded by official immunity.

Beasley, Judge, concurring in part and dissenting in part.

I agree with all except Divisions 2 and 5 and those parts of Division 6 which summarize them.

1. The reason that I must file this partial dissent is that it appears that the official immunity asserted by Dr. Cooper would prevent recovery by Jerry Swofford, the patient, as well.

It has been held by the Court that the doctor's approval of the two-week pass as a part of Jerry's therapeutic/recreational treatment was a discretionary act. It is the nature of the act which controls. *Partain v. Maddox*, 131 Ga. App. 778, 783 (206 SE2d 618) (1974); *Price v. Owen*, 67 Ga. App. 58 (19 SE2d 529) (1942). " 'The single overriding factor is whether the specific act from which liability alleg-

edly arises is discretionary or ministerial.' [Cit.]" *Shuman v. Dyess*, 175 Ga. App. 213, 216 (333 SE2d 379) (1985). Thus it is not who is injured as a proximate result of that act, or what the relationship between the alleged tortfeasor and the injured party is, that determines whether official immunity applies. That is, it makes no difference to the application of the limited official immunity that patient Jerry Swofford's injuries were attributable to negligence in medical treatment, assuming such latter was proved. Official immunity intervenes even where the negligence by the doctor injures the patient, and not only where it injures third parties. I do not see that the relationship between the tortfeasor and the injured party creates an exception to the official immunity rule here, where there is a physician and patient, any more than did the relationship of warden and inmate in *Gray v. Linahan*, 157 Ga. App. 227 (276 SE2d 894) (1981). It is inconsistent for the Court to hold that the defendant "was cloaked with official immunity," which means that the act was a discretionary one performed as part of the defendant's official duties, and then also hold that the act was merely medical treatment rather than performance of an official duty.

I respectfully suggest that *Jackson v. Miller*, 176 Ga. App. 220 (335 SE2d 438) (1985) be overruled because it does not make the distinction between sovereign immunity, which relates to suits against the state and its departments and agencies and insulates the state treasury, and official immunity, which relates to suits against officials and employees personally and insulates their decision-making and their own purses.

It is true that Dr. Miller could not invoke the doctrine of sovereign immunity because he was not being sued as an agent of the state. Ga. Const. 1983, Art. I, Sec. II, Par. IX. Instead, he was being sued individually. The immunity found in *Hennessey v. Webb*, 245 Ga. 329 (264 SE2d 878) (1980), is of the latter sort.

I agree with the special concurrence in *Roberts v. Grigsby*, 177 Ga. App. 377, 379 (339 SE2d 633) (1985) that *Jackson v. Miller*, 176 Ga. App. 220, supra, should be overruled. I cannot find the root of the rule stemming from *Jackson*. *Irwin v. Arrendale*, 117 Ga. App. 1 (159 SE2d 719) (1967), cited in *Jackson*, deals with sovereign immunity, not official immunity, and predates *Hennessey*.

2. It is difficult to understand that the reasoning in *Martin v. Ga. Dept. of Public Safety*, 257 Ga. 300 (357 SE2d 569) (1987) controls this case.

As shown by the record, the insurance covering Dr. Cooper is comprehensive general liability insurance established pursuant to Ga. L. 1977, p. 1051 under a self-insurance scheme by the Department of Administrative Services. That Act, as amended, now comprises OCGA Title 45, Ch. 9, Art. 1. It permits the purchase of insurance, as addi-

tional compensation to officials and employees, to cover them "to the extent they are not immune from liability against personal liability for damages arising out of the performance of their duties or in any way connected therewith." Section 2 of that Act permitted the self-insurance mechanism as opposed to separate policies purchased by each agency which chose to provide this type compensation for its officials and employees. The scope of the authorization is now codified in OCGA § 45-9-1, and the self-insurance alternative method for implementing the same appears as OCGA § 45-9-4.

The insurance, which is a liability trust fund, agrees to pay only sums "which the insured [employee] shall become legally obligated to pay," and it expressly states that it "shall be governed by and construed under and in accordance with the laws of the State of Georgia." Nowhere does it, or the Act, give any indication that the official immunity established much prior to passage of the Act was no longer to be a legal defense.

I fail to understand how the 1983 Constitution of the State of Georgia changed this. Art. I, Sec. II, Par. IX provides for sovereign immunity of the state from suit. Neither the state nor any of its departments or agencies is being sued by Swofford. Thus the limited waiver yielded by the sovereign state in that provision to the extent the General Assembly provides liability insurance which will cover the damages instead of the state treasury being the source for the same, does not seem to relate to plaintiffs' attempt to reach Dr. Cooper's own pocket or the insurance provided as compensation to her, which insurance covers her non-immune acts and guards her personal assets by paying when she is found liable. This would generally occur when she is sued for an act other than a discretionary, uncorrupt act done in the performance of her official duties.

The distinction between a suit against the state and a suit against a state employee or official individually was observed in *Florida State Hosp. v. Durham Iron Co.*, 194 Ga. 350, 352 (21 SE2d 216) (1942): "A sovereign State can not be sued in one of its courts except by consent of the proper authorities . . . The rule . . . related to actions . . . where the judgment will affect the State's control over or diminish its property or assets by enforcing a liability against the same . . . 'any suit against an officer or agent of the State, in his official capacity, in which a judgment can be rendered controlling the action or property of the State in a manner not prescribed by statute, is a suit against the State.' and can not be brought without her consent . . . A suit against a State officer or agent as an individual is not one against the State. Consequently, where State officers or agents are sued personally, the suit is generally maintainable . . ." Id. at 353. See also *Crowder v. Dept. of State Parks*, 228 Ga. 436 (185 SE2d 908) (1971).

Although neither the state nor any of its departments or agencies is a party defendant in this suit, it should be pointed out that the 1977 Act, to make clear that the provision of insurance to protect state employees' personal assets was in no way to be construed to constitute a legislative waiver of the immunity of the *state* from suit, expressly so provided in Section 3 thereof. After adoption of the new constitution, the legislature reiterated this position in 1986 when it amended this section, which has been codified as OCGA § 45-9-5, to include the following explicit statement of its intent: "The exercise of authority provided in this article shall not constitute the provision of liability insurance protection under Article I, Section II, Paragraph IX of the Constitution." Ga. L. 1986, p. 150.

Official immunity is not the same as sovereign immunity. As well-stated in Restatement (Second) Torts, § 895D, Comment B: "The basis of the immunity has been not so much a desire to protect an erring officer as it has been a recognition of the need of preserving independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits. This, together with the manifest unfairness of placing any person in a position in which he is required to exercise his judgment and at the same time is held responsible according to the judgment of others, who may have no experience in the area and may be much less qualified than he to pass judgment in a discerning fashion or who may now be acting largely on the basis of hindsight, has led to a general rule that tort liability should not be imposed for conduct of a type for which the imposition of liability would substantially impair the effective performance of a discretionary function."

It has been similarly stated in Georgia: "It is a well-established principle that a public official who fails to perform purely ministerial duties required by law is subject to an action for damages by one who is injured by his omission. However, it is equally well established that 'where an officer is invested with discretion and is empowered to exercise his judgment in matters brought before him, he is sometimes called a quasi-judicial officer, and when so acting he is usually given immunity from liability to persons who may be injured as the result of an erroneous decision; provided the acts complained of are done within the scope of the officer's authority, and without wilfulness, malice, or corruption.' [Cit.]" *Gormley v. State*, 54 Ga. App. 843, 847-848 (189 SE 288) (1936). See *Gray v. Linahan*, supra.

Considering all of the foregoing, I fail to comprehend how *Martin* subjects Dr. Cooper to further maintenance of this lawsuit. If the insurance covers only non-immune acts, which is what is authorized by law, it is not involved because as the majority states, this was a discretionary act. If it does cover discretionary acts which were formerly considered immune from suit, it is not the type of insurance which

waives sovereign immunity under the 1983 Constitution as this is not a suit against the state in the first place and it is not the type of insurance which the state acting through its General Assembly intends to constitute a constitutional waiver.

That being the case, I cannot concur in Division 5 either. In sum, I would uphold the grant of summary judgment to defendant.

DECIDED JULY 31, 1987 —

*Paul A. Dietrick*, for appellants.

*Michael J. Bowers, Attorney General, William C. Joy, Senior Assistant Attorney General, Mary Foil Russell, Assistant Attorney General, Bruce M. Edenfield*, for appellee.