**Sheila Lynn H. SPENCE, individually and as Administratrix of the Estate of Elizabeth Thurmond Green, and Sheryl H. Jones, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 3:98–CV–54 DF.

United States District Court,
M.D. Georgia,
Athens Division.

Feb. 2, 2001.

John Chapman Bell, Jr., Augusta, GA, for Plaintiffs.

Brendan F. Flanagan, Columbus, GA, for Defendant.

## ORDER

FITZPATRICK, District Judge.

This case came before the Court for a non-jury trial on December 18, 2000, and December 19, 2000. After considering the testimony and evidence adduced at trial, including the exhibits, as well as the parties' post-trial briefs, the Court hereby enters the following findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT

1. Sheila Lynn H. Spence is the daughter of the decedent, Elizabeth Thurmond Green, and is the duly-appointed representative of Ms. Green's estate.

2. Sheryl H. Jones is also the daughter of the decedent, Elizabeth Thurmond Green.

3. The decedent, Elizabeth Thurmond Green, is the mother of Geoffrey W. Hodges. She was murdered at her home in Walton County, Georgia, on March 31, 1996.

4. On March 17, 1997, Ms. Spence and Ms. Jones filed a claim with the Department of Veterans Affairs for the wrongful death of Ms. Green. By letter dated December 23, 1997, that claim was denied. On March 26, 1998, Ms. Spence and Ms. Jones sued the United States in this Court for wrongful death based on Ms. Green's murder. As Administratrix of Ms. Green's estate, Ms. Spence also sued to recover for Ms. Green's pain and suffering and for the funeral and burial expenses incurred by the estate.

5. Geoffrey W. Hodges is a paranoid schizophrenic. He has a history of mental illness, substance abuse, and violence dating back to 1979. As a result of his delusional and violent behavior, he has been arrested, hospitalized, and incarcerated numerous times since 1979.

6. Mr. Hodges was discharged from the Navy in 1979 because of behavioral problems stemming from his mental illness. After his discharge, he was arrested by the Walton County Sheriff's Department for engaging in threatening behavior toward his family. The Superior Court of Walton County ordered him to be admitted to Athens General Hospital on November 9, 1979. He was released on December 3, 1979.

7. On February 21, 1980, Mr. Hodges was admitted to Central State Hospital in Milledgeville, Georgia, upon order of the Superior Court of Walton County. He had been charged with making terroristic threats. On April 8, 1980, he was discharged as competent to stand trial.

8. On September 2, 1980, Mr. Hodges was transferred from the Georgia Mental Health Institute to the Veterans Affairs Hospital in Decatur, Georgia. He was discharged on November 6, 1980.

9. On June 16, 1981, Mr. Hodges was admitted to Central State Hospital. He had been incarcerated for threatening to kill a man who sold him a van. On July 16, 1981, he was discharged as competent to stand trial.

10. On October 16, 1981, Mr. Hodges was transferred to Georgia Regional Hospital from the Georgia Mental Health Institute upon court order. He was described as "hostile, combative with auditory and visual hallucinations." He was discharged to the VA Hospital in Augus-

ta, Georgia, on November 23, 1981, where he remained until April 29, 1982. During this time, he "threatened to cut up his mother in pieces because he thought she was in bed with an alien."

11. On August 19, 1983, Mr. Hodges was transferred to Georgia Regional Hospital from the Walton County jail. On August 23, 1983, he became agitated and almost violent while visiting with his mother. He was transferred to the VA Hospital in August, Georgia, on August 23, 1983. He left the hospital on October 1, 1983, and did not return.

12. On December 7, 1983, Mr. Hodges was admitted to Georgia Regional Hospital following his arrest by the Athens Police Department for demolishing his trailer with an axe and running naked through the woods for three days. He was transferred to the VA Hospital on December 15, 1983.

13. On April 3, 1984, Mr. Hodges was admitted to Georgia Regional Hospital from the Walton County jail upon court order "for a pretrial evaluation of charges of abusive, obscene language, three counts of criminal trespass, burglary, theft by shoplifting and simple assault." While there, it was noted that he "had same delusions [which] . . . may represent fixed delusions." He was discharged to the Walton County jail on April 11, 1984. After being found not guilty by reason of insanity, he was admitted to Georgia Regional Hospital on May 14, 1984, where he stayed until July 10, 1989. During this time, he "went on several trial visits; however, he seemed to always get into some sort of problems, either drugs or noncompliance."

14. On May 30, 1990, Mr. Hodges was admitted to Georgia Regional Hospital from the Walton County jail following his arrest for battery. He was transferred to Georgia Regional Hospital "because of aggressive and violent behavior towards officers and fellow inmates." While there, a large roach was flushed from his left ear.

He was remanded to the Walton County Sheriff on June 7, 1990.

15. On June 22, 1990, Mr. Hodges was admitted to Georgia Regional Hospital on a physician's certificate because of "potential harm to others as manifested by threatening his neighbor." He was discharged on June 26, 1990. During this time, he began taking Prolixin, which is a medication used in the treatment of schizophrenia.

16. On September 5, 1990, Mr. Hodges was admitted to Georgia Regional Hospital for pretrial evaluation from the Walton County Sheriff's Department after he failed to appear for a simple battery charge. He was given Prolixin and discharged to the Walton County Sheriff on September 13, 1990.

17. On November 15, 1990, Mr. Hodges was transferred to Georgia Regional Hospital from the Georgia Mental Health Institute, where he had been admitted for engaging in threatening behavior. The following note appears in his medical records: "After serial exam, patient was very violent and had to be placed in seclusion . . . patient remained angry." He was subsequently transferred to the VA Hospital.

18. On April 21, 1991, Mr. Hodges was admitted to Georgia Regional Hospital on hold order from the Walton County Sheriff's Department for driving under the influence and for an outstanding bench warrant.

19. On January 27, 1992, Mr. Hodges was transferred from Georgia Regional Hospital to the VA Hospital. He was described as "very hostile and threatening. Mood was angry and hostile and affect was angry and uncooperative." He was discharged on February 21, 1992.

20. On March 13, 1992, Mr. Hodges was admitted to Georgia Regional Hospital upon order of the probate court following his arrest for "threatening people and demonstrating bizarre behavior." He was discharged on March 24, 1992.

21. On April 12, 1992, Mr. Hodges was admitted to Georgia Regional Hospital on a physician's certificate after he got into a fight. He was discharged on April 14, 1992.

22. On July 10, 1992, Mr. Hodges was admitted to Georgia Regional Hospital upon order of the probate court. The medical records indicate that "he was not compliant with his medications and he was becoming violent and hostile . . . homicidal ideation toward President Bush . . . previous suicide attempt by drug overdose . . . required seclusion and restraints at one time." He was discharged on July 30, 1992.

23. On October 3, 1992, Mr. Hodges was admitted to the VA Hospital. He was discharged on October 16, 1992.

24. On November 6, 1992, Mr. Hodges was admitted to Georgia Regional Hospital after telling his probation officer that he needed help. He was discharged on November 24, 1992.

25. On April 23, 1993, Mr. Hodges was admitted to Georgia Regional Hospital on a hold order from the Walton County Sheriff's Department for disorderly conduct, violation of his probation, and a bench warrant. He was discharged on May 4, 1993. The records from this time indicate that he regarded his mother as the most supportive person in his life, but that she tried not to confront or upset him in any way because he had been physically aggressive towards her in the past.

26. On August 17, 1993, Mr. Hodges was admitted to Georgia Regional Hospital upon order of the probate court "for threatening to kill people; no specifics. He was acutely psychotic . . . was noncompliant with medications and mental health care." He was transferred to the VA Hospital on August 26, 1993, where he remained until he was discharged on September 13, 1993.

27. On October 26, 1993, Mr. Hodges was admitted to Georgia Regional Hospital on a physician's certificate. On November 4, 1993, he was returned to the Walton County jail to complete serving his sentence.

28. On April 7, 1994, Mr. Hodges was admitted to Georgia Regional Hospital from the Walton County Sheriff's Department on hold for charges of criminal trespass and making terroristic threats against his mother. He was discharged to the Walton County Sheriff on May 9, 1994. During this time, he was described as "somewhat psychotic," and he "did not meet the treatment plans."

29. On January 1, 1995, Mr. Hodges was admitted to Georgia Regional Hospital on a physician's certificate. He had been at Phillips Correctional Institute "apparently for criminal trespass . . . he remained quite delusional and they did not feel comfortable releasing him back into the community. . . . He was quite delusional when he came in, thinking that his mother was a transsexual and therefore could not be his mother." He was discharged on January 20, 1995.

30. On June 16, 1995, Mr. Hodges was admitted to Georgia Regional Hospital from the Walton County Sheriff's Department after being charged with failure to appear for a court hearing. While in jail, he had refused medication, was hostile and paranoid concerning his family, and threatened to kill family members when he was released. He was discharged to the Walton County Sheriff's Department on June 26, 1995.

31. On July 20, 1995, Mr. Hodges was admitted to Georgia Regional Hospital on hold order from the Walton County Sheriff's Department "for evaluation of hallucinations and refusal to take Haldol." He was discharged to the Walton County Sheriff's Department on August 1, 1995.

32. On February 13, 1996, Mr. Hodges was transferred to Georgia Regional Hospital from Phillips Correctional Institute, where he had been incarcerated since August 1995. The medical records indicate that "no physical violence was displayed"

by him and that "his anger was all verbal during his hospital stay." Nevertheless, the staff at Georgia Regional Hospital initiated commitment proceedings because they "felt he was somewhat dangerous because he was so irritable." A commitment hearing was held on March 1, 1996, in the Probate Court of Richmond County, Georgia. Mr. Hodges was found to pose a risk of danger to himself and others because of his paranoid, delusional, and physically aggressive behavior. As a result of this hearing, he was committed for long-term care. On March 5, 1996, he was transferred to the VA Hospital in Augusta, Georgia.

33. Upon his commitment to the VA Hospital on March 5, 1996, an interdisciplinary treatment team was assigned to treat Mr. Hodges. The team was headed by Dr. William D. Magharious, a physician who had been practicing psychiatry since 1959 and had treated thousands of potentially dangerous patients throughout his career. The other members of the team included Belinda Walker, a licensed clinical social worker who had substantial experience assessing and treating potentially aggressive patients; Elaine Chisholm, a psychiatric clinical nurse specialist who had substantial experience assessing and treating potentially aggressive patients; Fernanda Gordon, a registered nurse in psychiatry; Lorraine Jackson, a registered nurse; and Marsetta Lash, a registered nurse. The team conducted a mental status examination of Mr. Hodges that morning. The form that was completed upon Mr. Hodges' admission indicated that the reasons for his admission were that he had been incarcerated for threatening his family and that he had violated a restraining order that his mother had taken out against him.

34. When Mr. Hodges was admitted to the VA Hospital, Ms. Walker obtained his records from Georgia Regional Hospital. These records indicated that he had been incarcerated at Phillips Correctional Institute for violating a restraining order that his mother had obtained against him. Dr. Magharious was aware of these records. However, when Dr. Magharious questioned Mr. Hodges about his arrest and incarceration, Mr. Hodges said that he had been arrested for disorderly conduct.

35. The members of Mr. Hodges' treatment team at the VA Hospital knew that he had been admitted to psychiatric hospitals many times prior to his March 5, 1996 commitment. They also knew that he had a history of not taking his medications when he was discharged from these hospitals. They also knew that his anger and violent behavior was often directed at his family, particularly his mother. Specifically, Dr. Magharious gave the following testimony that indicates his awareness of Mr. Hodges' history:

- Q And what significance do you attach to that, that he was willing to—that he wanted to get treatment?

  A He accepted to be given a shot of medicine every two weeks, which is new to him to be that cooperative and want to get better.

  Q Okay. And when you say that was new to him, are you basing that on your previous experience with him?

  A Right, right.

  Q All right. How was he the previous times you had seen him before 1996?

  A Before '96, he usually can get angry easily and hates to take any medication and just doesn't like to stay in the hospital, not this kind of cooperative patient that I saw in '96. He not as cooperative at the time.

- This form needed to be filled to justify admission, if the patient need admission, so it is a short mental status. And this was gathered with other mental status together to justify the admission. So what I wrote was [Reading] This is a 39–year–old white single man, 10th grade education, Navy veteran; has been discharged from 1–E on 9/13/93 after 17 days of hospitalization for schizophrenia and polysubstance abuse.

He was admitted to Georgia Regional Hospital and committed on 2/13/96 and remained there until 3/5/96. He has been in jail for questionable 3 months and for questionable reasons.

Q And Geoffery Hodges was coming there with paranoid schizophrenia, wasn't he?

A Yes.

Q And a history of antisocial behavior?

A Antisocial behavior, yes.

Q Transferred out of a prison?

A No, transferred from the State hospital.

Q Prison to State hospital to VA, right?

A Right.

Q History of violence to his family, right?

A History of violence, yes.

Q Let me get back to my question. You were aware that he had a prior history of dangerousness and some very serious mental problems; were you not?

A He has a history, and I want to repeat the word 'history.' His history does not stick to any individual for life.

Q And do you see there the note that Belinda Walker wrote, filling out about talking to the mama and such as that?

A Right.

Q And you see in there where she says [reading] he cannot live with her because he previously beat her up twice?

A Right.

Q Did you know that before then?

A Right.

Q You did?

A I did.

Q You already knew about that?

A I knew about that.

Q Before she made that call?

A Before?

Q Before she made—

A No, no, no, after she made the call.

Q Did you do anything to try to find anything further about his past violent behavior directed towards his mama, other than ask him and hear what the social worker said?

A I am sorry; I did not understand.

Q Other than ask Geoff Hodges about prior aggression towards—well, excuse me. Let me ask you, did you ever ask Geoffery Hodges about his prior aggression towards his mama?

A I ask him about all of past aggressions towards everybody.

Q Okay. Did you ask him specifically about past aggression towards his mother?

A Well, he was—I don't recall that exactly, because we found it that the day we give the order—can you repeat it again? I'm trying to give you the correct answer. Did I ask him if he had beaten his mother?

Q Uh-huh (affirmatively).

A We should have, but I don't know exactly. I think we informed him about his behavior, why he was not admitted to her home and he has to stay in the hotel because of that. I think we did.

Q Do you know that you did?

A I'm not sure.

Q Excuse me. Do you know whether you did or not, ask him about his past aggression towards his mama?

A What I recall that we explained to him why he has to stay in the hotel, and this includes past aggression.

Q Did you ask him about it; why, what he did, why he did it, what feelings he had towards her?

A I cannot recall exactly. I cannot recall. I cannot say yes or no.

Q But you didn't ask him about the particular area of aggression that he had been hospitalized for, did you?

A We asked him about all of his behavior outside, why he was committed, and why he was—what you call that?

. . . .

Q Did you have any idea when you released him how many times he had been in mental hospitals and for what reasons?

A Oh, yeah, I have a good idea about all since he was in the Navy. He was in the Navy from age 16 to 20. Well, we know all of his history. He was treated since he was in the Navy.

Q Well, do you know how many hospitalizations he had?

A No, I don't know how many.

Q Did you know how many times he had been arrested for violent or aggressive behavior?

A I don't know how many, but he was arrested for—what you call that?—disturbing the peace.

Q Did you know of others, dozens of others, arrests?

A I know he has been arrested before several times.

Q Okay. For aggressive behavior?

A Aggressive behavior.

36. Under Dr. Magharious' supervision, Mr. Hodges' treatment at the VA Hospital consisted of individual counseling, group therapy, and medication therapy.

37. During Mr. Hodges' stay at the VA Hospital, he never committed any act of physical aggression. Ms. Walker testified that Mr. Hodges seemed hostile when he was admitted to the VA Hospital, but that his behavior changed as his therapy progressed:

He became manageable, cooperative, co-operative in the sense of behavior. He was no longer hostile. He was stable. He agreed to take the medication. He was given privileges where he could go out. He honored the rules of the unit level. He left on time, came back on time. He participated in our work therapy program at the VA. He attended group therapy. He participated in the community meetings, and he did not show any aggressive behavior toward anyone.

The medical records support this description of Mr. Hodges' progress. As Dr. Magharious testified, "It's all of the—all of the interviews show that he became non-dangerous.... We made a full analysis that he is not danger[ous] by stating exactly his behavior [in the records]."

38. Dr. Magharious described the meetings that the treatment team conducted with Mr. Hodges as follows:

We all sit together at the round table confronting the patient, and I interview the patient as the leader of the team, and if anybody want[s] to ask any further question, then they can ask. In the meantime, while I am interviewing the patient, somebody would be writing this interview.

This is what I learned when I was in Boston. It's better to concentrate on the patient rather than you write and look at the patient, write and look. So you concentrate on the face of the patient to see his expression, his attitude, and how he talks, rather than what he talks, more important. And somebody else was writer at the interview.

. . . . .

... That's why when I was interviewing the patient, I look at exactly what phrase, you know, or statement he does, and I tell them, the one that's writing, this is important, had to be included.

. . . . .

A patient can say something with hostility in his expression without—cannot be noticed in the way you say, so I can pick up this kind of hostility. Or he may be responding to voices and saying, No, I don't hear any voices, and he would be

listening to voice. So I can pick up these things.

39. During his treatment at the VA Hospital, Mr. Hodges' medication was changed to Prolixin, a drug that is successful in treating schizophrenia. He was given oral doses of Prolixin three times every day, for a total of 30 milligrams per day. He was also given Prolixin by intramuscular injection. He was given an injection of 37.5 milligrams once every 2 weeks, including one on March 19, 1996. Because intramuscular injections of Prolixin have a much longer effect than oral doses, they can be given every 6 weeks. Blood tests confirmed that "his blood level of the medicine is very good, very therapeutic." Mr. Hodges was also given 200 milligrams of Tegretol, which is used to reduce irritability and impulsivity, twice per day.

40. As Dr. Magharious testified, Mr. Hodges showed "very steady improvement." Dr. Magharious further testified that "he was cooperative, he accepted the treatment, he was sleeping well, and he was attending the community meeting, and we felt that he was ready for privilege." As a result of this evaluation, Dr. Magharious decided to grant Mr. Hodges privileges on March 12, 1996. However, before Mr. Hodges could be granted privileges, a second psychiatrist was required to concur. Dr. Ananda Pathiraja examined Mr. Hodges and agreed that privileges would be appropriate. These privileges allowed Mr. Hodges to walk around the VA Hospital grounds during designated times, but did not allow him to leave the premises.

41. About 2 weeks after Mr. Hodges was granted privileges, he asked for a weekend pass so that he could visit his mother. Before such a pass could be granted, Ms. Green's consent was required.

42. Ms. Walker telephoned Ms. Green to ask if Mr. Hodges could come for a visit. Ms. Walker described her conversation with Ms. Green as follows:

[Mr. Hodges] did agree to give his mother's phone number. He gave me her name and he said that I could call her, and I did, Judge, Your Honor. I called his mother, Mrs. Green and I identified who I was and where I was calling from, and I told her that I was calling on behalf of her son Geoffrey Hodges, and she was very pleasant over the telephone.

She was excited to hear from him when I told her who I was calling about, and I told her that he had asked if he could have a pass. We would not grant a pass to him unless she was agreeable to it or unless she found some reason she did not want him to come. She said that she did want him to come. She was excited about it.

She wanted to know how he was doing. So I told her that he had been transferred to us from Georgia Regional and that he was stable, he was on his medication, that he was not exhibiting any aggressive or violent behavior, that he was cooperative, and told her he was involved in groups, that he was going to our work therapy program, and he was participating in unit activities, and he was handling and managing privileges well. That he was not going to be discharged, but because he was stable and asked for this, we were calling to see what she would like.

She said that she wanted him to come. She said she was glad that he had asked about her, and the she said, Well, I will come for him himself [sic]; and on second thought, she said no, she was going to have surgery, esophagus surgery.

So I said, Well, he cannot come.

She said yes, he could still come but he could not stay with her.

And I said, are you sure you want him to come?

And she said, Yes, I want him to come. He just can't stay with me.

She said, There are three hotels here. He can stay in one of them. She told

me that he had used drugs and had beat her up twice in the past.

And I said, Are you sure you want him to come, because he doesn't have to come?

And she said, Oh, yes, I want him to come. He can come and visit me, but he can't stay here.

.    .    .    .    .

Again, as I said, I had asked her several times. She said, You know how mother's [sic] are, and she said, He can come; but she wasn't going to be able to do it.

Dr. Magharious approved the weekend pass for Mr. Hodges at 10:00 a.m. on March 26, 1996. Although Plaintiffs suggested that Dr. Magharious approved the pass before Ms. Walker spoke to Ms. Green, any discrepancy as to the timing of the telephone call is immaterial because Ms. Walker informed Dr. Magharious of her conversation with Ms. Green before Mr. Hodges was released on March 29, 1996.

43. Defendant's expert witness, Dr. Richard L. Elliott, testified that Ms. Walker's notification was proper and showed that she was "probing several times, to get a sense if this would be acceptable." Dr. Elliott also testified, "She knew that Mrs. Green would be ambivalent. She wanted to find out if it would be acceptable." Dr. Elliott further testified, "I'm sure [Ms. Green] had some reservations about it, some serious reservations, but she seemed willing to have him back, genuinely willing, even when [Ms. Walker] seemed to probe a little for that. So I thought she did a reasonable assessment and gave Mrs. Green the opportunity to say, No, absolutely not, he's not coming back to this community."

44. Although Ms. Green told Ms. Walker that she did not want Mr. Hodges to stay with her because he had beaten her up twice in the past, Ms. Walker did not inquire into when the beatings occurred, how severe the beatings were, or whether

Mr. Hodges was taking anti-psychotic medication at the time the beatings occurred. Upon being informed of Ms. Walker's conversation with Ms. Green, Dr. Magharious did not seek, nor did he direct any other member of the treatment team to gather, any such information concerning the prior beatings.

45. Dr. Pathiraja testified by deposition that he would have wanted more information concerning Mr. Hodges' violence towards his mother before granting the pass and that he would not have granted the pass without that information.

46. Before Dr. Magharious granted the weekend pass, he and the treatment team were generally aware of Mr. Hodges' history of violence and illness as well as his prior beatings of his mother. However, other than the note that Ms. Walker penned regarding her conversation with Ms. Green, there is no documentation in the medical records of any inquiry or discussion by the treatment team concerning Mr. Hodges' aggression and violence towards his mother. Similarly, there is no evidence that the treatment team evaluated the nature and extent of Mr. Hodges' prior incarcerations and commitments to mental institutions for violent behavior before the pass was granted.

47. A minimal investigation would have revealed that Mr. Hodges' delusional and aggressive behavior towards his mother began at least as early as 1982 when he reported to the VA Hospital staff that he wanted to cut his mother into pieces because he thought she was in bed with an alien. Such an investigation also would have revealed that on October 22, 1993, Mr. Hodges was arrested for breaking into his mother's house and threatening to kill her.

48. Despite Ms. Green's consent for Mr. Hodges to visit her, she was terrified of her son. According to the testimony of Nell Gibson, who lived across the street from Ms. Green, on one occasion Ms. Green telephoned her to ask if it looked

like somebody was inside her house. When Ms. Gibson responded that somebody was indeed inside her house, Ms. Green telephoned the Sheriff's Department. An officer went to Ms. Green's house and removed Mr. Hodges from the premises. According to the testimony of Catherine Stowe, a friend of Ms. Green, on another occasion Ms. Green came to her house crying and visibly shaken. Ms. Green had red marks on her face and neck as a result of being attacked by Mr. Hodges. Ms. Green told each of her close friends who testified that she was afraid of Mr. Hodges and believed that he would harm her one day.

49. Ms. Green's consent for Mr. Hodges to visit her is consistent with other testimony given by her daughters and friends that she deeply cared for all her children, including Mr. Hodges, and that she always wanted to help them if she could.

50. Dr. Magharious and Ms. Walker testified that Mr. Hodges was stable and not psychotic or delusional when he left the hospital for his mother's house. They also testified that a weekend pass is a part of the treatment plan because it allows the team members to determine how well the patient will function in the community upon discharge. Dr. Magharious admitted that there was some risk in allowing Mr. Hodges to visit his mother, but he decided that the risk was worth taking because he expected that the visit would be therapeutic for Mr. Hodges. As Dr. Magharious testified,

This was very important to me especially, that this young man has been rejected everywhere, and he doesn't feel that he is accepted or loved by anybody, and when the mother say that she want to see him, I felt like this is a very good step to start relation with the family and will be the first step to start discharge planning for him. It's easy for me to say no, and that's it, but I took the risk

that this man could benefit so much from this visit, so I said yes.

Dr. Magharious also testified,

I felt giving him the pass by welcoming mother is the first step to have a good discharge plan for him. I needed to find something—somebody not to reject this man and accept him, and this was a good step to do that. And I could say, No, no, no pass, but I took the risk, because this man's pass could start something new for him. He's a human being, and we need to do something for him so that the community would not reject him anymore.

Dr. Magharious further testified,

Q Now, I'm just going back to my question. In this case with Geoffery Hodges, when you were told he had beat his mother twice, when she tells the social worker, it didn't cause you some concern about whether or not he should get that pass?

A It give me concern, but it happened in the past.

Q Did you weigh that factor in at all in deciding whether to give that pass to him?

A Did they weigh that?

Q Did you weigh that, sir?

A Did I weigh that?

Q Yes.

A Of course, we weigh every possibility, but we have to find a way to respect the patient's right and show that we can give him a pass if he improved.

Finally, Dr. Magharious testified,

Q You didn't think that when she said, He can't stay here, and he's beaten me twice, that was more like a caution light or a red light than a green light?

A A majority of our patient have problems of getting into trouble with the law. If we deny them any pass because something happen—unless the

family said, No, I don't want to see him here; I don't want him again.

51. Dr. Magharious testified that Mr. Hodges never exhibited any violent, aggressive, or threatening behavior while he was a patient at the hospital. With regard to Dr. Magharious' assessment of how dangerous Mr. Hodges was before he left for his mother's house, Dr. Magharious testified,

He was very pleasant, very cooperative. There is no anger feeling on his face or somebody that seem hallucinating or restless, and sleeping very well and took his medicine; and they look at his lab tests; his blood level of the medicine is very good, very therapeutic. I think it was 8—which 6 to 10 is very good. So pleasant and cooperative, and he did not show any kind of hostility at that time. He did not threaten anybody, and he was told what he supposed to do and he accepted whatever he was supposed to do.

52. On March 29, 1996, Mr. Hodges was released from the hospital for the weekend. He had withdrawn $300 from his account at the hospital to buy a gift for his mother. He was given a round-trip bus ticket to Monroe, Georgia.

53. On April 1, 1996, Mr. Hodges placed a 911 call in which he said that he had killed Ms. Green by choking her and stomping her to death. Mr. Hodges also said that he was not sure if Ms. Green was dead, but that he hoped she was dead. Mr. Hodges told the dispatcher that Ms. Green was not his mother, but that she had kidnapped him at birth, and that he had to kill her.

54. Officer Terry Haymore was dispatched to Ms. Green's house, and when he entered the house he saw Mr. Hodges still talking to the dispatcher. Officer Haymore also saw Ms. Green on the floor with her head lying in a pool of blood. There was a boot print on Ms. Green's right cheek. Mr. Hodges told Officer Haymore that Ms. Green "said she had

esophagus surgery, but that was the hardest throat I've ever seen."

55. Officer Haymore testified that he recognized Mr. Hodges and was familiar with him from previous arrests. Officer Haymore had arrested Mr. Hodges a couple of years earlier for breaking into an elderly lady's house and threatening to kill her son and the entire family because he believed that her son owed him money. Officer Haymore also testified that Mr. Hodges had a reputation for violence in the community and that it was generally known among police officers that he should not be approached without backup.

56. Mr. Hodges was arrested for murder and taken to Georgia Regional Hospital on April 1, 1996, where he was found to be actively psychotic. He was evaluated by the Superior Court of Walton County on October 17, 1997, to determine if he was competent to stand trial. The court found that he was psychotic and was not competent to stand trial even though he had been taking anti-psychotic medication throughout his hospitalization. Thereafter, he was transferred to the Binion Building at Central State Hospital in Milledgeville, Georgia, where he presently resides.

57. An autopsy performed on Ms. Green on April 1, 1996, revealed multiple contusions to her head and a "hinge-type" fracture to the base of her skull. The examiner who performed the autopsy concluded that she died as a result of blunt force trauma to her head. The examiner also noted evidence of strangulation. The examiner determined that all her head and neck injuries were acute and pre-mortem. The death certificate lists the cause of death as blunt force trauma to the head by stomping.

58. This case involves a so-called "battle of the experts." Dr. Dave M. Davis testified for Plaintiffs, and Dr. Richard L. Elliott testified for Defendant. Both experts are well-qualified, and the Court found both to be credible witnesses. That being said, the Court acknowledges Defen-

dant's impeachment of Dr. Davis with his testimony given in a similar case in 1991. The principal areas of disagreement between the experts concern whether the assessment and treatment of Mr. Hodges satisfied the standard of care and whether Ms. Green's death was foreseeable.

59. Dr. Elliott testified that the assessment and treatment of Mr. Hodges was appropriate and satisfied the standard of care. Specifically, Dr. Elliott testified that (1) the mental status examination was appropriate, (2) the appropriate problems were identified, (3) the medication was appropriate, (4) the documentation of the treatment was appropriate, (5) Dr. Magharious' patient load was appropriate, and (6) the decision to grant the weekend pass was appropriate.

60. Dr. Elliott also testified that Ms. Green's death was not foreseeable. He explained, "Our ability to predict that somebody is going to go out and do something so horrible is almost negligible. The British Medical Journal just last year had an article in there where he gave something like 1 out of 30. We can predict 1 out of 30. It's almost negligible." He testified that "you have to ask yourself was it possible to have predicted at that time that this would have happened, and the answer was it was not possible."

61. Dr. Davis testified that the assessment and treatment of Mr. Hodges was below the standard of care. Specifically, Dr. Davis testified that (1) the initial assessment was inadequate, (2) the documentation of the treatment was inadequate, (3) Dr. Magharious' patient load was too high, (4) the monitoring of Mr. Hodges' delusions was inadequate, (5) the overall treatment of Mr. Hodges was inadequate, (6) the dangerousness assessment conducted prior to granting the weekend pass was inadequate, and (7) the decision to grant the weekend pass was not appropriate.

62. Dr. Davis also testified that Ms. Green's death was foreseeable. In a 1991 trial, however, Dr. Davis testified that the United States was not negligent because psychiatrists cannot predict dangerousness with any accuracy. According to the written opinion provided by Dr. Davis in advance of that trial,

> [T]he plaintiff alleges that the Army personnel should have been able to predict that Sergeant Burton was going to act in a homicidal manner. Clearly, this would have called for some special knowledge on the part of the defendants, in that they would have had to have been able to predict the future.
>
> ... Such homicidal statements are quite common under these circumstances, and to this point, psychology has not developed a way of predicting with much accuracy, particularly in the long-term, who will act out on these impulses.
>
> ... Psychiatrists are not clairvoyant.... No one has shown that psychiatrists have any special powers in so far as predicting dangerousness.
>
> The American Psychiatric Association has spent a great deal of effort trying to convince courts, attorneys, and law enforcement agencies that psychiatrists do not have special powers to predict dangerousness. Clearly, the profession itself is fully aware of it's [sic] limitations in this area. It is also clear that police agencies, judges, parole boards and citizens at large are also unable to make these predictions with any great accuracy.
>
> In such cases where threats are made, the only absolute way to be safe would be to incarcerate all individuals who make such threats. Clearly, this would violate civil rights, and would be extremely unpractical, ending up with huge numbers of individuals placed in some type of incarceration, either in jails or in mental hospitals. It simply is not a reasonable alternative.

That case involved issues that were similar to the issues involved in this case, but the patient in that case had a history that was different from Mr. Hodges' history. Dr.

Davis testified that his opinion in that case was correct at the time, but that progress in the area of dangerousness assessment has made it possible to make predictions with respect to some subgroups. Dr. Elliott testified that Dr. Davis' 1991 opinion "was right on the money" and that it is still correct today. In support of this conclusion, Dr. Elliott cited the most recent issue of the Journal of the American Academy of Psychiatry and Law, in which 3 doctors concluded that predicting dangerousness is not practical.

63. Mr. Hodges has a long history of psychiatric treatment and violence, but there was no evidence that the standard of care required the treatment team at the VA Hospital to research and obtain all of Mr. Hodges' prior records. In fact, both experts agreed that the hospital was not required to do this and that the treatment team was entitled to treat Mr. Hodges as he was presented to them. However, Dr. Elliott testified that a patient's relevant history is very important when trying to predict dangerousness. In addition, Dr. Elliott admitted that Mr. Hodges' history showed a significant pattern of risk. Nevertheless, he maintained that the decision to grant the weekend pass was appropriate. Dr. Magharious echoed these arguments when he admitted to having knowledge about Mr. Hodges' history of dangerousness and mental problems: "He has a history, and I want to repeat the word 'history.' His history does not stick to any individual for life."

64. Although the standard of care did not require the treatment team at the VA Hospital to research and obtain all of Mr. Hodges' prior records, Dr. Elliott and Dr. Magharious acknowledged that it did require the treating physician to do a dangerousness assessment prior to granting a weekend pass to a patient who suffers from paranoid schizophrenia and anti-social disorder. Dr. Elliott also acknowledged that a patient's relevant history is very important when trying to predict dangerousness. According to Dr. Davis, such a dangerousness assessment requires the treating physician to conduct a personal interview with the patient to enable the physician to evaluate the patient's dangerousness. The factors to consider include (1) the degree of the patient's paranoia, (2) the likelihood that the patient will engage in substance abuse while away from the hospital and the possible safeguards that could be used to guard against that risk, (3) the patient's capacity for empathy and insight into his past misconduct, (4) the patient's present interest in guns or other weapons or the ways in which he has harmed people in the past, (5) the patient's present level of disgruntlement, (6) the current status of the patient's anti-personality disorder, (7) whether the patient is presently suicidal or psychotic, (8) whether the patient is subject to hallucination, (9) the patient's level of depression, (10) the patient's history of violence, (11) the patient's awareness of and compliance with his psychiatric treatment, (12) the patient's awareness of things that may set him off, and (13) the patient's level of denial. Dr. Davis testified that the failure to conduct such an evaluation before granting a weekend pass is below the standard of care.

65. Dr. Magharious testified that all the interviews with Mr. Hodges and notes in the chart, when taken together, constituted a dangerousness assessment. However, he admitted that no formal dangerousness assessment was performed.

66. Dr. Elliott agreed that a psychiatrist who is contemplating a weekend pass for a patient has an obligation to take reasonable steps to prevent foreseeable harm from occurring to people with whom the patient might come into contact once the patient is released. With regard to paranoid schizophrenia, Dr. Elliott testified that not all paranoid schizophrenics are dangerous to others, but that some are quite dangerous to others. Dr. Elliott also testified that there are some paranoid schizophrenics who, because of their history of violence, their history of non-cooperation, or the fact that they do not appear to

be treatable, must be confined because they are too dangerous to have at liberty. In addition, Dr. Elliott testified that some paranoid schizophrenics direct their violence towards particular people, but some have a more general propensity for violence, and that by evaluating a patient's history, a psychiatrist can identify a particular person or persons to whom the patient has shown violent attitudes and behavior. Dr. Elliott further testified that isolated, specific instances of conduct are not necessarily significant for assessing a patient's dangerousness or propensity for violence, but that the overall pattern of behavior would be significant. Finally, Dr. Elliott testified that Mr. Hodges' overall pattern of behavior showed an unusually high pattern of risk and dangerousness and that this overall pattern might be of the type that necessitates long-term institutional care.

## II. CONCLUSIONS OF LAW

1. The Court has subject-matter jurisdiction over this case. *See* 28 U.S.C.A. § 1346(b)(1) (West Supp.2000).

2. All pre-suit requirements have been satisfied. *See* 28 U.S.C.A. §§ 2401(b), 2675(a) (West 1994).

3. As the sovereign, the United States is immune from suit unless it specifically and expressly consents to being sued. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). When Congress enacted the Federal Tort Claims Act, it waived the sovereign immunity of the United States for claims involving certain kinds of tortious conduct committed by federal employees in the course of their employment. *See* 28 U.S.C.A. §§ 2671–2680 (West 1994). Specifically, the FTCA provides, "The United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C.A. § 2674.

4. The substantive law of the state where the tortious act or omission occurred governs claims brought under the FTCA. *See Creekmore v. United States,* 905 F.2d 1508, 1510 (11th Cir.1990). Thus, the substantive law of Georgia controls the outcome of this case.

5. Almost 70 years ago, the Georgia Supreme Court recognized the power of the legislature "to attempt to preserve human life by making homicide expensive. It may impose an extraordinary liability ... not only upon those at fault, but upon those who, although not directly culpable, are able nevertheless in the management of their affairs to guard substantially against the evil to be prevented." *Western & Atl. R. Co. v. Michael,* 175 Ga. 1, 165 S.E. 37, 42–43 (Ga.1932). The Georgia legislature has exercised this power by enacting a wrongful death act, the current version of which is codified at O.C.G.A. §§ 51–4–1 to –5 (2000). As it relates to this case, the act creates a right of action in a child or children for the homicide of a parent. *See* O.C.G.A. § 51–4–2(a). According to the act, " 'Homicide' includes all cases in which the death of a human being results from a crime, from criminal or other negligence, or from property which has been defectively manufactured, whether or not as the result of negligence." O.C.G.A. § 51–4–1(2). Recovery under the act is not for the injury to the decedent, but rather for the injury suffered by the surviving child's or children's loss resulting from the death of a parent. *See Miles v. Ashland Chem. Co.,* 261 Ga. 726, 410 S.E.2d 290, 293 (1991).

6. Plaintiffs may properly sue under Georgia's wrongful death act because Ms. Green's death was proximately caused by a homicide committed by Mr. Hodges.

7. Plaintiffs brought this case under Georgia's wrongful death act on the theory that Mr. Hodges' criminal act was reasonably foreseeable to Dr. Magharious and the treatment team and that Ms. Green's death was proximately caused by

Dr. Magharious' negligence in granting the weekend pass and failing to exercise proper control over Mr. Hodges' freedom to leave the hospital. Therefore, this case is essentially a negligence action. To prevail in a negligence action in Georgia, Plaintiffs must prove the following elements:

> "(1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty."

*Bradley Center, Inc. v. Wessner,* 250 Ga. 199, 296 S.E.2d 693, 695 (1982) (quoting *Lee St. Auto Sales, Inc. v. Warren,* 102 Ga.App. 345, 116 S.E.2d 243, 245 (1960)). This case is not a medical malpractice action because there was no doctor-patient relationship between either Ms. Spence or Ms. Jones and Dr. Magharious. *See id.* at 695, 696–97.

■ 8. The legal duty involved in this case arises from "the general duty one owes to all the world not to subject them to an unreasonable risk of harm." *Bradley Ctr., Inc. v. Wessner,* 250 Ga. 199, 296 S.E.2d 693, 695 (1982). Specifically, in the context of this case,

> "where the course of treatment of a mental patient involves· an exercise of 'control' over him by a physician who knows or should know that the patient is likely to cause bodily harm to others, an independent duty arises from that relationship and falls upon the physician to exercise that control with such reasonable care as to prevent harm to others at the hands of the patient."

*Id.* at 695–96 (quoting *Bradley Ctr., Inc. v. Wessner,* 161 Ga.App. 576, 287 S.E.2d 716, 721 (Ga.Ct.App.1982)). Thus, there is a two-part test that must be satisfied before this duty arises: (1) the physician must exercise control over the patient, and (2) the physician must have known or reason-

ably should have known that the patient was likely to injure another. *See Ermutlu v. McCorkle,* 203 Ga.App. 335, 416 S.E.2d 792, 794 (1992).

9. As to the first part of this test, Mr. Hodges undoubtedly had a special relationship with Dr. Magharious and the treatment team. Mr. Hodges had been involuntarily committed to the VA Hospital's care, and as the treating physician, Dr. Magharious exercised control over Mr. Hodges' treatment and freedom, at least during Mr. Hodges' period of commitment. Therefore, the first part of the test has been satisfied.

■ 10. As to the second part of the test, the traditional rule in Georgia is that intervening criminal acts of third parties cannot give rise to liability because they are not foreseeable. *Bradley Center, Inc. v. Wessner,* 296 S.E.2d 693, 696 (1982). However, liability for negligence attaches if an intervening criminal act of a third party is foreseeable: " 'The general rule that the intervening criminal act of a third person will insulate a defendant from liability for an original act of negligence does not apply when it is alleged that the defendant had reason to anticipate the criminal act.' " *Id.* (quoting *Atlantic Coast Line R.R. Co. v. Godard,* 211 Ga. 373, 86 S.E.2d 311, 315 (1955)). For an injury to have been foreseeable, " 'it is not necessary that [a defendant] should have been able to anticipate the particular consequences which ensued.' " *Swofford v. Cooper,* 184 Ga.App. 50, 360 S.E.2d 624, 628 (1987) (en banc) (quoting *Emory Univ. v. Lee,* 97 Ga.App. 680, 104 S.E.2d 234, 243 (1958)). Instead, all that is required for liability to attach is that the defendant, exercising ordinary prudence, " 'might have foreseen that some injury would result from his act or omission, and that consequences of a generally injurious nature might result.' " *Id.* (quoting *Emory Univ.,* 104 S.E.2d at 243). In other words, " '[n]egligence is predicated on what should have been anticipated rather than on what happened.

And one is not bound to anticipate or foresee and provide against that which is unusual or that which is only remotely and slightly probable.' " *Brogdon v. Wal–Mart Stores, Inc.,* 496 S.E.2d 499, 500 (1998).

11. Given Mr. Hodges' long history of paranoid schizophrenia, violence (especially towards his mother), substance abuse, and failure to take his medication upon discharge, as well as the circumstances surrounding his commitment to the VA Hospital, it was reasonably foreseeable that some injury would result from his release from the hospital on an unsupervised weekend pass. As Dr. Magharious' testimony demonstrates, he was generally aware of Mr. Hodges' history, and he had specific knowledge of Mr. Hodges' prior beatings of his mother, though he did not know when they occurred, how severe they were, or whether Mr. Hodges was taking anti-psychotic medication at those times. The Court applauds Dr. Magharious' obvious sincerity in providing the best possible treatment for his patients, but the health or life of people with whom a patient might come into contact during an unsupervised weekend pass cannot be subordinated to the therapeutic value of granting a patient such a pass. In this regard, it is clear that Dr. Magharious gave great weight to the potential benefits of the pass to Mr. Hodges, but it is equally clear that Dr. Magharious gave little, if any, consideration to other factors such as Ms. Green's health and safety. In fact, Dr. Magharious admitted that there was a risk in granting the pass, but he ignored that risk so that Mr. Hodges could benefit from the therapeutic value of the pass. Moreover, Dr. Magharious' eagerness to treat and discharge Mr. Hodges was never more apparent than when he testified,

> I felt giving him the pass by welcoming mother is the first step to have a good discharge plan for him. *I needed to find something* —somebody not to reject this man and accept him, and this was a good step to do that. And I could say, No, no, no pass, but I took the risk,

because this man's pass could start something new for him. He's a human being, and we need to do something for him so that the community would not reject him anymore.

In addition, Dr. Magharious testified, "Of course, we weigh every possibility, *but we have to find a way to respect the patient's right* and show that we can give him a pass if he improved." These passages, especially the italicized portions, show that Dr. Magharious was concerned about Mr. Hodges' well-being to the exclusion of the well-being of those with whom he might have come into contact during that weekend, including his mother. Although 20/20 hindsight proves that Dr. Magharious' decision to grant the pass was ill-advised, there were enough red flags to indicate that some injury might result from an unsupervised weekend pass for Mr. Hodges and that such a pass was inappropriate. Given Dr. Magharious' awareness of Mr. Hodges' history and the prior beatings of his mother, it was more than remotely or slightly probable that Mr. Hodges would harm his mother. Therefore, the second part of the test has been satisfied because Dr. Magharious should have been able to anticipate or foresee that Mr. Hodges would cause some harm during that weekend.

12. The testimony of Dr. Elliott and Dr. Davis shows that there is some disagreement as to how accurately psychiatrists can predict dangerousness. Nevertheless, Dr. Magharious acknowledged that the standard of care required him to do a dangerousness assessment of Mr. Hodges prior to granting him a weekend pass. Dr. Elliott and Dr. Davis agreed that any dangerousness assessment must take into account the patient's relevant history, and even Dr. Elliott admitted that the overall pattern of Mr. Hodges' behavior was significant in the assessment of his dangerousness or propensity for violence. Dr. Davis elaborated by enumerating the factors that must be considered when assessing a patient's dangerousness, and Dr.

Elliott did not directly rebut this testimony. Even though Dr. Magharious did not conduct a formal dangerousness assessment of Mr. Hodges, those factors can still be balanced based on the documentation of Mr. Hodges' treatment. At the time Dr. Magharious granted the pass, Mr. Hodges did not exhibit any disgruntlement, his mental condition was stable, he was not suicidal or psychotic, and he had been compliant with his treatment. However, he had a high degree of paranoia, he had a history of substance abuse, he exhibited no capacity for empathy or insight into his past misconduct, he was subject to hallucinations, he had been subject to depression, and he had a long history of violence, especially towards his mother and other family members. The Court concedes that these factors may not have enabled Dr. Magharious to predict that Mr. Hodges was going to murder his mother or that Mr. Hodges was going to commit any specific act, but that is not the standard for foreseeability. Instead, liability for negligence attaches if any harm was foreseeable. The balance of the factors enumerated by Dr. Davis should have indicated to Dr. Magharious that the probability of Mr. Hodges causing some harm during that weekend, especially to his mother, was more than remote or slight.

13. Because both parts of the *Bradley Center* test have been satisfied, Dr. Magharious had a duty to exercise his control over Mr. Hodges so as to prevent him from harming others. Dr. Magharious breached this duty by granting Mr. Hodges an unsupervised weekend pass when they should have known that Ms. Green's health or life was in danger. Even assuming, as Defendant argues, that Dr. Magharious was under an obligation to treat Mr. Hodges in a setting that was the least restrictive of his personal liberty, Dr. Magharious is not absolved of liability. The least restrictive treatment must be provided in the context of the particular patient involved, and in this case the least restrictive treatment did not justify an unsupervised weekend pass.

14. Dr. Magharious' breach of his duty to exercise control over Mr. Hodges so as to prevent him from harming others proximately caused Plaintiffs' injuries. Therefore, Defendant is liable to Ms. Spence, in her individual capacity and in her capacity as Administratrix of Ms. Green's estate, and to Ms. Jones under Georgia's wrongful death act.

■ 15. Defendant argues that it is immune from liability because Dr. Magharious acted in good faith when he granted the pass to Mr. Hodges. Under Georgia law,

> Any physician, psychologist, peace officer, attorney, or health official, or any hospital official, agent, or other person employed by a private hospital or at a facility operated by the state, by a political subdivision of the state, or by a hospital authority created pursuant to Article 4 of Chapter 7 of Title 31, who acts in good faith in compliance with the admission and discharge provisions of this chapter shall be immune from civil or criminal liability for his actions in connection with the admission of a patient to a facility or the discharge of a patient from a facility.

O.C.G.A. § 37–3–4 (1995). However, this statute does not immunize Defendant for two reasons. First, as the language of this statute makes clear, it applies only to actions taken in connection with the admission or discharge of a patient from a facility. "It has no application to actions concerning the treatment of a patient. Consequently, it has no application to hourly, daily or holiday visitation passes dispensed by a physician in the treatment process." *Swofford v. Cooper*, 184 Ga. App. 50, 360 S.E.2d 624, 628 (1987) (en banc). Because the weekend pass that Dr. Magharious granted to Mr. Hodges was not a discharge under this statute, Defendant is not entitled to immunity. Second, this statute is inapplicable to this case because the VA Hospital is not a private hospital, a state-operated facility, or a hospital authority created pursuant to Georgia law.

16. Defendant also argues that it is immune from liability because the VA Hospital is a healthcare facility that provides services without the expectation or receipt of compensation. Georgia law provides immunity for certain healthcare providers who, "voluntarily and without the expectation or receipt of compensation," provide services for and at the request of a hospital. O.C.G.A. § 51–1–29.1 (2000). Because there is no evidence that Dr. Magharious or anybody else at the VA Hospital did not expect to be compensated for their treatment of Mr. Hodges, this statute is inapplicable to this case. Moreover, the VA Hospital is not a charitable institution within the meaning of this statute because the healthcare it provides is considered to be part of the compensation package used to induce people to join the military. *See White v. United States*, 317 F.2d 13, 16 (4th Cir.1963); *Whitaker v. Talbot*, 122 Ga.App. 493, 177 S.E.2d 381, 383 (1970).

## III. CONCLUSION

In conclusion, the Court must observe that had Dr. Magharious or Ms. Walker told Ms. Green to come to the VA Hospital in Augusta to visit her son under strict supervision, a more informed decision as to the risk of harm that Mr. Hodges posed to his mother would have been possible. Surely the details of the prior beatings could have been examined, and to a trained eye, Mr. Hodges' deeply felt hostility towards his mother might well have become obvious. All the warning signs were there prior to Mr. Hodges' fateful visit home, and had these warning signs been heeded, this tragedy could have been avoided.

Accordingly, after weighing the evidence and applying the law, the Court finds that Plaintiffs have satisfied their burden of persuasion and that Defendant is liable to Plaintiffs for the wrongful death of their mother.

Having found that Defendant is liable to Plaintiffs for the wrongful death of Ms. Green, the Court must now consider the issue of damages. Because of the importance of this issue, the Court hereby orders counsel for the parties to appear in Macon on Thursday, February 22, 2001, at 2:00 p.m., for a hearing to determine Plaintiffs' damages. This hearing shall consist of oral argument only; no witnesses will be necessary. Counsel need not submit briefs prior to the oral argument. Counsel's arguments shall include all aspects of Plaintiffs' damages, but counsel is specifically directed to address whether Mr. Hodges is entitled to recover under Georgia's wrongful death act. It appears to the Court that Mr. Hodges cannot recover for his own wrongful act, but the Court desires full argument on the subject. Defendant is advised that the Court has already determined that recovery under Georgia's wrongful death act does not run afoul of the Federal Tort Claims Act's prohibition on the recovery of punitive damages. *See Molzof v. United States*, 502 U.S. 301, 305–08, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992) (holding that the FTCA prohibits only damages that are considered legally punitive, not damages that may have a punitive effect, and defining "punitive damages" as damages that depend on the nature of the defendant's conduct); *Childs v. United States*, 923 F.Supp. 1570, 1581–84 (S.D.Ga. 1996). Accordingly, the Court will not hear arguments on this subject.